HURTT vs. FISHER.—June, 1827.

An executor empowered to sell lands by last will, having sold them in 1814, and put the purchaser in possession, it was his duty, if the sale was for *cash*, payment being refused, to have sued; if on *credit*, he ought, within a reasonable time, to have obtained bond and security for the purchase money; and at all events should have retained possession of the land until the necessary security was given. Omitting to sue at law until 1819, he was *prima facie* guilty of gross negligence, and responsible, as a a trustee would be, for the proceeds of the land from the time of the sale, deducting his reasonable expenses and commission.

A trustee, with power to sell, and having sold lands, being informed that a deed was required by a purchaser, to whom he had sold and given possession, and that the purchase money would be paid when the deed was executed, doubting his right to execute a deed, yet not obtaining a decree, ratifying his sale for 4 years, is bound to show the circumstances beyond his control, to justify this delay.

A trustee is responsible for money lost by his gross negligence.

Lands devised to be sold are thereby turned into money, and considered in equity as personal estate. A wife being entitled to the proceeds of such land, dying after a sale of it, her husband surviving, is entitled to the proceeds thereof.

APPEAL from *Kent* County Court, sitting as a Court of Equity. The bill filed by the appellee on the 13th of March 1823, stated that in the year 1814 *James Hurtt* died seized and possessed of a considerable real and personal estate, leaving nine children, viz. *Mary, Henry, Samuel, Elizabeth, Adah, Martha, James, Sarah* and *Ruelma*, the three last minors, under the age of 21 years. That the said *Hurtt* by his last

will, dated the 26th of January 1813, directed that all his lands in *Queen-Anne's* and *Kent* counties should be sold under the direction of his executor therein named, and upon such terms as might be most to the benefit of his estate, and the sales thereof to be accounted for by his executor as part of his estate; and also that certain parts of his personal estate should be sold and accounted for by his executor as part of his estate; and that all his children should be equally entitled to his estate, both from the sales of his land, and his personal property of every kind. And by his said will he constituted and appointed his son *Henry Hurtt*, (the appellant,) executor thereof, who took upon himself the execution of the said will. That on or about the 26th of August 1814, *Henry Hurtt* sold to *James Salisbury* the land situate in *Kent* county, of which the testator died seized, for the sum of $14 50 per acre, amounting in the whole to $2,784. That *Henry Hurtt* permitted *Salisbury* to take possession of the land without ever obtaining from *Salisbury* any security for payment of the purchase money, except *Salisbury's* own responsibility. That on the 29th of August 1819 the complainant intermarried with *Adah Hurtt*, one of the children of the testator, and that she died on or about the 18th of February 1821, without leaving any child. That *Henry Hurtt* brought a suit in *Kent* county court in September 1819 against *Salisbury*, for recovery of the purchase money due for the land sold as aforesaid, and obtained judgment against him at March term 1821, for $3,223 63, and costs of suit. In the rendition of which judgment *Salisbury* obtained an allowance for one-ninth of the original purchase money, he having intermarried with one of the daughters of the testator. That *Henry Hurtt* permitted *Salisbury* to hold, possess, use and occupy, and to receive the issues and profits of the said land from the year 1814 until September 1819, without using any legal process or means to obtain security for payment of the purchase money, or to recover the purchase money, or to regain possession of the land. That *Henry Hurtt* had never paid to the complainant, or to his wife *Adah*, any money either on account of any rents, issues or profits, or on account of the purchase money of the said land. The bill then states, that since the rendition of the judgment

above mentioned, *H. Hurtt* had become possessed of the land which he had sold to *Salisbury*, and now holds the same.  *Prayer*, that *H. Hurtt* may be compelled to pay to the complainant the one-ninth part of $2,784, with interest on such ninth part, &c. and for general relief.  The answer of *H. Hurtt*, the defendant, (now appellant,) admits the death of his father *James Hurtt*, and that he died seized and possessed of a considerable real and personal estate, leaving the children named in the bill; and by his will devised and disposed of his property as stated in the bill, and that the defendant took upon himself the execution of said will, &c.  That he advertised for sale the land mentioned in the will, and at the sale of the land in *Kent* county, in August 1814, *Samuel Boyer* became the purchaser thereof for the sum of $14 50, per acre, amounting in the whole to $2,784.  That *Boyer*, at the time of the sale, declared that he had purchased the land for *James Salisbury*, to whom the said land was charged by the defendant, the said *Salisbury* being at that time confined by indisposition, and not able to attend the sale.  That *Salisbury* was then in good credit, and considered and reputed to be in good circumstances, and the defendant felt perfectly secure.  That by the conditions of the said sale, possession of the land was to be given on the 1st of January 1815, on which day possession was accordingly delivered to *Salisbury*, who had seeded wheat on the said farm in the preceding fall.  That some time after the 1st of January 1815, the defendant called on *Salisbury*, and requested him to give his bond for the purchase money with such security as the defendant should approve, when he was informed by *Salisbury* that so soon as the defendant would give him a deed for the land purchased by him, he would pay the defendant therefor, as he was in constant expectation of receiving a large sum of money from the sales of *John Black's* real estate; and that the defendant was not authorised by the said will to give such deed.  The defendant having been instructed that he was not authorised by the said will to give a deed for the land sold by him, had a bill filed in the court of chancery, and obtained a decree in 1818, authorising and empowering him to make a deed for the said land.  After which the defendant again called on *Salisbury* for payment

of the land, who promised to pay for the same, but neglected, and ultimately refused to do so; whereupon the defendant in 1819 brought suit against him in *Kent* county court for the purchase money—the land having been very materially injured and lessened in value since the sale of it in 1814; and the defendant then, and still believing, that if again sold it would not have brought, by a large sum, the price at which it had been sold to *Salisbury.* That at September term 1820, the said suit was referred to *Ephraim Vansant,* &c. by rule of the court, and the said arbitrators returned their award to court, and judgment was thereupon entered; which award included the original purchase money of the land, with interest thereon, also an account due from *Salisbury* to *J. Hurtt,* the testator, and sundry other transactions between the defendant and *Salisbury,* and for which the defendant had also sued *Salisbury.* From all which it will be seen, that after deducting from the claims allowed to *Salisbury* against the defendant as executor and trustee of *J. Hurtt,* deceased, the sum of $140 75, for the debt due from *Salisbury* to *J. Hurtt,* deceased, and which debt the defendant, in the settlement of the personal estate, had acknowledged and became answerable for as a sperate debt, there remained the sum of $802 40, to be credited as a payment by *Salisbury* for the purchase money of the land. The answer further stated, that at the time of the rendition of the judgment against *Salisbury,* he had become utterly unable to pay the same; and the defendant, believing that *Salisbury* was insolvent, and being unwilling to enter into a suit in chancery to obtain a second sale of the said land, and to eject *Salisbury,* had at sundry times applied to him, and did not obtain the possession until shortly after harvest in July 1822. That a day or two after the defendant had taken possession, *Salisbury* threatened to proceed against the defendant for a forcible entry and detainer; and the defendant believing it to be as unprofitable as it was unpleasant to enter into a law suit with *Salisbury,* agreed to execute, and did execute, a paper purporting to release *Salisbury* from the judgment, in consideration of his giving up the full possession of the land to the defendant, and *Salisbury* thereupon executed a paper, purporting to be a release, &c. The defendant thereupon advertised the said land to be sold on

the 7th of September 1822, but there being no purchaser, the land was again advertised to be sold on the 15th of March 1823, when the same was sold to *Edward Hurtt* at and for the sum of $7 25, amounting in the whole to $1,435 50. That the defendant, finding that there was very little prospect of selling the land for a large price, had authorised *Edward Hurtt* to bid for the same for and on the behalf of him the defendant; and *E. Hurtt*, having been the highest bidder and purchaser, the defendant has since kept possession of the land, considering it his own property, and holds himself liable to the devisees of his father, or to their proper representatives, for their several and respective proportions of the price at which the same was sold. The defendant denies that he at any time received any other sum for or on account of the purchase money of said estate from *Salisbury*, other than the credit in the said award by the referrees, or for or on account of the profits of said land, except what money he considered a fair price for a crop of wheat which was seeded on the land in 1822 by the defendant, and which was reserved by the defendant at the sale in 1823. That in giving a release to *Salisbury* the defendant relinquished his claim to the sum of $161 98, with interest thereon, of his own money, due from *Salisbury* to him for goods sold, it being in part of the amount for which the award and judgment had been rendered, and that he was induced to do so from a well grounded belief that *Salisbury* never would pay the claim, and that in the meantime the land purchased by him would regularly become less valuable. The defendant admitted that the complainant did intermarry with *Adah Hurtt*, and that she is since dead, without ever having had issue by the complainant. He submits to the court whether the complainant can claim or recover any part of the money due for the sale of the said land, or whether the right and interest of the said *Adah* in and to the same, does not survive to the other children and heirs at law of *J. Hurtt*, deceased. He admits he never paid to the complainant, or to his wife *Adah*, any part of the purchase money, or any thing for or on account of rents or profits of the said land. The County Court, [*Earle*, Ch. J. and *Purnell*, and *Wright*, A. J.] passed the following decree, viz. The court are of opinion that the land in *Kent* county, devised by *James*

*Hurtt* to be sold, is to be considered as money, and that his daughter *Adah's* part of it has devolved on the complainant by his marriage with her. The court therefore adjudge that *James Fisher,* the complainant, in right of his wife is entitled to, and that he recover of the said *Henry Hurtt,* the trustee, one ninth part of the proceeds of the sale of the said land, sold by him to *James Salisbury* in the month of August 1814, deducting therefrom all reasonable expenses of the said trustee, as well as a reasonable sum for his commissions—the said trustees having, in the judgment of the court, been guilty of the grossest neglect in his negotiations with *Salisbury,* and in the management of the trust fund. *Decreed,* that the defendant pay to the complainant the sum of $295 22½, with interest from the 1st of January 1815 till paid, according to the statement annexed, and costs. From which decree the defendant appealed to this court.

The cause was argued at last June term before Buchanan, Ch. J. and Martin, Stephen, Archer and Dorsey, J.

*Chambers,* for the Appellant, contended, 1. That the bill of complaint does not sufficiently charge gross neglect in the defendant below to justify the decree. 2. That it was not competent in the court to pass the decree without a previous reference to the auditor, before whom the defendant could have claimed and proved his expenses and disbursements necessarily incurred in the execution of his trust.

*Eccleston,* for the Appellee, insisted, 1. That after the sale of the land on the 27th day of August 1814, made to *James Salisbury* by the appellant, as trustee under the will of his father, the right and interest of the appellee, and his wife *Adah,* in and to the amount of the sale thereof, must be considered *quasi* personal property; and that notwithstanding the death of the said *Adah* since the said sale, without ever having had issue born alive, the appellee, in right of his wife, is entitled to the same interest in and to the amount of the sale thereof as the appellee, and his wife *Adah,* would be entitled to were she still living.

2. That there has been such neglect and misconduct on the

part of the appellant as trustee under the will of his father, in relation to the sale of the said land, as renders him liable to pay unto the appellee the one-ninth part of the net amount of the sale of said land, as made on the 27th day of August 1814, together with legal interest thereon from the 1st day of January 1815, until paid.

3. That if the appellee is not entitled to the one-ninth part of the amount of the sale, as made on the 27th day of August 1814, he is entitled to such other relief in the case as a court of equity would think proper to grant unto the appellee, and his wife *Adah*, were she still living

*Curia adv. vult.*

MARTIN, J. at this term, delivered the opinion of the Court. That a trustee is answerable for money lost by his *gross* negligence, is a principle of law well established; and whether *Hurtt* has been guilty of such negligence as to make him answerable for the amount of the purchase money on the first sale, must depend upon the facts admitted in the answer.

It appears the will was proved in 1814, and that in August of the same year the lands in *Kent* county were sold by *Hurtt* to *Salisbury.* The terms of this sale, whether for cash, or on credit, are no where stated in the record. If it was for cash, it was the duty of the trustee, upon payment being refused, to have instituted legal process to enforce it; and if on credit, he ought, in a reasonable time after the sale, to have obtained from the purchaser, bond and security for the purchase money; and at all events, the possession of the land ought to have been retained by him until the necessary security was given. But we find in this case, that no security was ever obtained for the purchase money; and although the land was sold in 1814, no attempt was made to enforce the payment of it by legal process, until some time in the year 1819, and yet the possession of the land was given up to *Salisbury* in January 1815. This affords at least strong *prima facie* evidence of very gross neglect, and unless satisfactorily accounted for by the trustee, would make him liable for the money on the first sale. How does he attempt to avoid it? That *Salisbury* refused to pay the money until the trustee gave him a deed, and *that* he could not do, without an application to the court of chancery.

If a deed was necessary in this case, did the trustee use reasonable diligence to obtain authority to give it? He was informed in 1814 a deed was required by the purchaser, and that the money would be paid when a deed was executed; yet he never obtained a decree in chancery for this purpose, until the year 1818, about four years after the original purchase. If there were circumstances beyond his control to justify this delay, it was incumbent on him to have stated them in his defence; but in the absence of such allegations, which if they had existed, must have been in the knowledge of the trustee, the court have no right to presume them. If in a reasonable and proper time, the trustee had filed a bill in chancery to authorise him to give a deed, there can be no doubt that the chancellor, having all the proper parties before him, and there being no legal objection to the contrary, would have passed a decree to confirm the first sale; to authorise the trustee, upon the payment of the purchase money, to give a deed, and to order the money to be brought into court, to be applied, under the direction of the chancellor, according to the provisions of the will. But this was not the conduct of the trustee. Without any authority, (so far as this record speaks,) he again sold this land in 1823, and became himself, through his agent, the purchaser for seven dollars and twenty-five cents the acre, just one half of the original purchase money, and now holds and possesses the land, under that purchase. With this view of the case, the court must charge the trustee with grossly improper conduct, more especially as from the facts disclosed in the answer, there is strong ground to believe, if he had faithfully performed his trust, the original purchase money might have been saved. It is stated that *Salisbury*, at the time of the sale, was in good credit and circumstances, and if a deed had been tendered to him in a reasonable time, it is fairly to be presumed the purchase money would have been paid or secured to the trustee.

The next question presented to the court, in this case is, whether the purchase money arising from the sale of this land in 1814 is to be considered as money, and would devolve upon *James Fisher*, whose wife died after the sale?

We feel no difficulty upon this part of the case. We con-

cur in opinion with the court below, that the land in *Kent* county devised by *James Hurtt* to be sold, and sold in 1814, is to be considered as money, and that *James Fisher* is entitled to the same portion of it, upon the death of his wife, as he would have been authorised to receive, had she been alive.

The general rule of law, that lands devised to be sold are thereby turned into money, and construed in equity as personal estate, is fully sustained, not only by the authorities cited by the counsel for the appellee, but by many others, were it necessary to resort to them. See *Doughty vs. Bull,* 2 *P. Wms.* 320. *Lechmere vs. Earl of Carlisle,* 3 *P. Wms.* 215. *Best vs. Stamford,* 1 *Salk.* 154. *Maberly vs. Strode,* 3 *Ves.* 450, 456. *Trelawney vs. Booth,* 2 *Atk.* 307. *Craig vs. Leslie, et al.* 3 *Wheat.* 563. *Fisher's* wife dying after the sale, leaves no doubt of his right to recover.

DECREE AFFIRMED.