## FREDERICK LAMBERT ET AL. *vs.* J. PIERPONT MORGAN ET AL.

*Assignment of a Fund—Notice to the Holder—Priorities Between Assignments—Filing Assignment in Equity Cause—Conversion into Personalty of Land Devised to Be Sold—Recording of Mortgage Thereof Not Notice of Assignment.*

The assignment of a debt or fund is completed by notice thereof given to the debtor or depository of the fund. If, before such notice, the debtor or holder pays the fund to the assignor or to a subsequent assignee, he is discharged.

When the person entitled to a fund makes two or more assignments of it to different parties, the assignee who first gives notice to the debtor or custodian of the fund is entitled to priority of payment over other assignments, although made earlier in time.

When a fund is being administered in a Court of Equity the filing of an assignment of it in the cause is notice thereof to the trustee or custodian.

When a testator devises land to a trustee with directions to sell and reinvest and pay the income to a tenant for life, the will operates to convert the land into personalty from the death of the testator, although the time, manner and terms of sale are left to the discretion of the trustee.

In such case a mortgage of his interest in the land by the life tenant, made before a sale of the land, is inoperative. The recording of such mortgage is not notice to the trustee of the asignment of the income and creates no lien on the fund.

An instrument purporting to be a mortgage of his interest in the land by such legatee for life is to be treated as an assignment of the income.

*Decided February 19th, 1909.*

Appeal from the Circuit Court of Baltimore City (HEUIS-LER, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, WORTHINGTON and HENRY, JJ.

*Stewart Brown* and *Geo. Stewart Brown,* for appellants.

I. *Subject to the Registry Laws.* (1) All the mortgages here (whether held by the appellees or appellants) are con-veyances of the entire equitable life estate under the will held for Mrs. Williams in the *real* and personal property of testator, and all are duly executed, acknowledged and recorded among the Lands Records of Baltimore City.

This was proper because that entire equitable interest so held for her, and thus conveyed, included a large amount of *real* estate, and the authorities are conclusive that to make such equitable conveyances effectual as to the *real* estate, such registration was necessary. See *United States Ins. Co.* v. *Shriner,* 3 Md. Ch. 381, affirmed in *General Ins. Co.,* 10 Md. 517-523, a case of conflicting mortgages on the equity in land held under an unrecorded bond of conveyance and the application of the registry laws to such mortgages. The Chancellor says: "There is nothing, as I understand, in the language of the recording Acts which restricts them to conveyances of the legal estate; and in the words of the eminent Judge who delivered the opinion in *Hays* v. *Richardson,* 1 G. & J. 384, their design was that all rights, incumbrances or conveyances touching, connected with, or in any wise concerning land, should appear upon the public record." See also *Anderson* v. *Smith,* 6 Md. 52; *South Balto.* v. *Smith,* 85 Md. 537, 543; *Bryan* v. *Howland,* 98 Ill 630. This last being a trust case is directly in point. See also *Abell* v. *Brown,* 55 Md. 222.

We note the significant circumstance bearing on this point, that no English or Maryland lawyer (and there were more

than a score) in handling mortgages of her interest, has up to this time, *in actual practice,* ventured to treat Mrs. Williams' interest under the will otherwise than as an estate including an equitable interest in real property, or to treat her mortgages thereon otherwise than as including the conveyance of real estate, and as such requiring registration.

. *As to the alleged conversion of the really.* There was no equitable conversion by the will, for (1) The trust power is "to sell (or concur with any other persons or part owners in selling) the whole *or any part* of my said real personal and mixed estates."

This *ex vi termini* imports a discretion in the trustees whether to sell or not, and whether to sell the whole or a part and what part.

See the following new section incorporated into the text of last edition of Jarman on Wills, 2d Jarman, 6th edition (Bigelow) page 585 : "When however a trust for sale of land is expressly discretionary as regards *what parts* of the testator's estate shall be sold, no implied trust for conversion is raised especially if expressions applicable to real estate appear in subsequent provisions of the will." Citing *ReHotchleys,* 32 Ch. D. 408, where testatrix gave all her estate upon trust to sell *"such parts* thereof as shall not consist of money,"* and out of the proceeds to pay debts, etc., and invest the residue, and to "stand possessed of such *real* and personal estate, moneys and securities.

In conformity with the doctrine thus stated we have found no case where the trust is to sell the whole *or any part,* in which the realty is held to be converted. *Sage* v. *Lockman,* 53 Howard Prac., 276; *Chamberlain* v. *Taylor,* 105 N. Y. 185.

Again, the ultimate provision of the remainder of the estates after the life estates and subject to an annuity to Charles E. T. Williams is: "And I direct my trustees to stand possessed of my said residuary estate (subject to the before mentioned life interests and annuity) upon trust for my brother, Walter Scott Winans; but if the said Walter

Scott Winans shall die before obtaining a vested interest in any part of my estate, then I give, *devise* and bequeath my residuary estate (subject to the before mentioned life interests and annuity) to Thomas Winans, son of the said Walter Scott Winans, for his absolute use and benefit."

The property yet unsold is held by the trustees in equal moieties with Walter Scott· Winans, for whom the above remainder is now held by the trustees as above.

It is inconceivable that the testator could have intended to work a conversion of his undivided half of the realty, with all the attendant consequences to Walter Scott Winans' inheritance or holding of this property, one-half as real and one-half as converted into personalty.

Explicit directions as to the management of the estate only applicable to realty are given, while any part of it remains unsold, implying that he contemplated that the residue would contain realty even after a sale of a part.

Other expressions are also used as to the residue only applicable to realty, for example: the trustees are to cultivate the *real,* leasehold and mixed estates, belonging to the residue, and make expenditures for improvements, repairs and insurances.    He further speaks of the *rents* and profits, or the whole income produced from his residuary estate in its actual condition, whether consisting of *property* or investments, as payable from his death to the beneficiaries, and the estate is to be managed as before, that is to say, by General Latrobe, who, as the joint agent of himself and this brother, managed this real property and does so still.

These expressions by themselves negative any inference of constructive conversion.

This case is entirely unlike the cases where the testator plainly looked to an ultimate *division* of the estate among a number of persons, which coupled with a power of sale, would compel an ultimate conversion to accomplish the purposes of the will, as in *Stake* v. *Mobley,* 102 Md. 414.

Winans, on the contrary, gives the entire remainder to *one person* who then held and still holds an undivided half inter-

est in this land. He plainly intended that unless sold to advantage, with the concurrence of his brother, Walter Scott Winans (for being an undivided interest, this was the only way it could be sold to advantage), Walter Scott or his son should receive it in remainder as land, and thus get the entire title.

This negatives completely any "imperative mandate" to sell, and shows why the skilfull draftsman uses the word *devise* in respect to the ultimate remainder. See *Keller* v. *Harper,* 64 Md., at page 82.

*Assignment of Interest in Land.* The English rule in *Dearle* v. *Hall,* 3 Russ. 1, is confined by the Courts that adopt it to the simple case of a "fund" or "chose in action," mere personalty, and so even in England it is held that— "The doctrine of notice applicable in determining the priority of charges on choses in action, does not prevail as to *Equitable* interests in land." *Wilmot* v. *Pike,* 5 Hare, 11.

Again: "A personal chattel is held by possession, real estate by title. The rules of notice as to priority, do not apply to real estate interests." *Jones* v. *Jones,* 8 Simons, 633. See also—*Wiltshire* v. *Rabbits,* 14 Simons, 76. A case closely analagous to ours (the trust there being in *leaseholds* while ours in lands).

The authority of *Wiltshire* v. *Rabbits,* is upheld in a late case in the House of Lords. (*Ward* v. *Duncumbe.* A. C. (1893) 390.

*Conflicting Equities between the assignees.* There are other reasons why the claims of Morgan and the Union Deposit Bank do not come under the English rule, namely, that they have no superior equity, because Morgan had actual notice, and his mortgage was for a pre-existing debt, and the Bank's mortgage was to secure, by way of guaranty only, a pre-existing debt of Mrs. Williams' son.

Assuming for the sake of the argument that Mrs. Williams' estate was a chose of action, Morgan and the Union Deposit Bank claim a superior equity by reason of their coming into the case by petition ahead of us and ask that their mortgage

assignments should be given priority to ours, though subsequent in time because Mrs. Wiliams was given a fictitious credit in dealing with them and they were deceived into making loans upon her interest in her estate, thus invoking the principle of the English case of *Dearle* v. *Hall,* in order to advance their order of payment.

On the contrary, the facts and circumstances in the case show conclusively that they have no such equity over Lambert & Cooper, and Dixon. She obtained no false nor fictitious credit from them, on the contrary the record shows that they knew just what they were doing when they made the mortgages.

1st. *As to Morgan's Lack of Equity.* Stewart Brown's testimony brings home actual notice of the Lambert & Cooper's mortgage to Mr. Morgan's counsel and agent, and on April 26, 1901, Mr. Brown sent Mr. Barton a list of the mortgages, including Lambert's, etc., of May 15, 1900. Besides this actual notice, all the surrounding circumstances point to knowledge on the part of Morgan before he recorded his mortgage.

Mr. Barton, as the form of the mortgage itself shows at the time he recorded it considered Mrs. Williams' estate an equitable interest in land, subject to the registry laws. Presumably, when in the act of recording the mortgage among the land records on May 22, 1901, he would have, in fact, searched the records before filing, or else have been indifferent to what they disclosed, either because he had actual notice, as testified by Mr. Brown, or because he was taking for Morgan any security he could get, no matter what was ahead of it.

That does not indicate the situation of a person who has been induced to part with his cash by reason of a false or fictitious credit, and procuring thereby a superior equity over a prior encumbrance.

The recitals of the mortgage itself tend the same way corroborating the idea of actual notice to Morgan and showing he knew the estate was heavily encumbered. He says in the

mortgage: "Whereas said party of the first part has placed various mortgages upon her said life estate out of which have arisen various claims against the said party of the first part as to some of which said mortgages various controversies have arisen, etc."

And again: "Whereas in view of her non-residence in this county and her lack of means by reason of said mortgages said party of the first part has applied to said J. Pierpont Morgan to undertake the charge of her said interests and to render such assistance financially and otherwise in regard thereto as he may deem proper."

On December 27, 1901, he still treats it as a real estate mortgage (payable at any time when demanded) and prays the Court to make him a party. He asked for no *stop order* nor procured *any notice of any kind* to be served on the trustees which he would certainly have done if he was seeking to secure a chose in action. The only order which Morgan has ever obtained is the one then passed simply making him a party defendant to the cause.

This failure right here either to give any kind of notice to the trustee or to procure any kind of order on the fund absolutely precludes him from claiming any benefit from the so-called English rule governing the assignment of choses in action now asserted as an after-thought in an attempt to claim priority.

*As to the Union Deposit Bank's Lack of Equity.* They had been dealing with Mrs. Williams' son, Charles E. T. Williams, and had loaned him £400, secured by a recorded real estate mortgage upon his interest in the estate, which later was increased to £500, likewise secured by a recorded real estate mortgage.

Having no security from which to collect a debt against C. E. T. Williams until after Mrs. Williams' death, as Charles E. T. Williams' annuity follows her life estate, they seek to better and advance their security by procuring her indemnity mortgage for a debt due by him. Their mortgage recites that—"Whereas, there is now due and owing to the mort-

gagee the sum of five hundred and forty-five pounds by the mortgagor (as the mortgagor doth hereby acknowledge) in respect of *a guarantee given by her to the mortgagee* to secure the repayment to the mortgagee *of a debt of that amount due to the mortgagee* by Charles Edward Turnbull Williams, the son of the mortgagor."

Furthermore, their own recitals in the mortgage indicating their knowledge of uncertain and indefinite amounts of incumbrances prior to this mortgage, show they knew the complicated state of her interest, and that she obtained no false or fictitious credit from them, but they simply took the indemnity from her for what it was worth. ·

The mortgage itself provides for the use of the proceeds in case of sale; "secondly, to the extinguishment of any prior mortgage or encumbrance which has been placed upon said property, and *recorded* prior to this mortgage. And, "That the mortgagee may, in its discretion, take or procure in its own name or otherwise a transfer or transfers of any mortgage charge or incumbrance which may at the date of these presents or any time subsequent thereto be subsisting upon the above described property," etc.

The Union Deposit Bank recorded its indemnity mortgage on November 28, 1904, indifferent as the above chain of circumstances plainly indicate as to what the registry might disclose, but taking such additional security as it could get to indemnify its claim against C. E. T. Williams to advance its possibility of payment and secure it out of any interest she might have in her share of the estate.

Its learned counsel were satisfied to let it remain as a real estate security until March 9, 1907. After a careful search of the records in September, 1906, and finding it was still a long way from payment by reason of prior recorded mortgages, they invoke as an afterthought the chose in action theory and file their petition on March 9, 1907.

Even then the order obtained upon the petition is an order to show cause merely and no final order was obtained until February 10, 1908, long after the order of Lambert and

Cooper and Dixon which were obtained on the 11th and 13th of December, 1907.

In the *Elmbank,* 72 Fed. 610, the Court while expressly affirming the rule as to notice in *Dearle* v. *Hall,* etc., decide that an assignee of a chose in action who has not advanced his money at the time, but simply taken security for a antecedent debt is not such a purchaser as to come within the rule as to notice, and held that in such case priority of time governs between the successive assignees. Citing 2 *Pom. Eq. Jur.,* section 745, and cases there noted.

The Bank was not giving up anything but obtaining security for an antecedent debt due from the mortgagor's son, and by the indemnity thus obtained distinctly bettering its position. How in these circumstances can it claim a superior equity or ask to be advanced over prior incumbrances?

*The Judgment Claim.* We come now to the case and claim of Thomas Sprackman Bray, which, so far as it has not been already dealt with, stands in a class by itself.

As it now stands and comes to be determined by this Court on the record, it is unaffected by the questions discussed as to the other claims. Appellant's simple contention as to it is, that so far as any part of Bray's claim had any claim to a prior lien on the estate or was secured thereby, the evidence shows, and the very careful calculations of the auditor confirm it that *the claim has been fully paid.*

An *additional* claim has, however, been set up by Bray, which it is our purpose to demonstrate from the record, never was and is not now *a lien* on this property, prior to any mortgage.

Bray comes into this case on May 28, 1906, as the assignee of Ernest Vaughan, who was himself the assignee of a mortgage dated October 15, 1896, given by Mrs. Williams and her son Charles E. T. Williams to Sydney Cozens Hardy and Frank Jewson, and a further mortgage confirming the same dated November 18, 1896, and duly recorded.

The mortgage was to secure the payment of £600 and interest at six per cent., together with the premiums on

insurances to be kept up by the mortgagors, which would, of course, include interest on payments of insurance premiums made by mortgagees if not paid by mortgagors.

No other charge or expense of any description is mentioned in or stated to be secured thereby.

This was the utmost extent of the obligation. On payment of these items, and only these, the mortgage was to become and did become void.

Now just here we point out by reference Auditor's Account U, filed September 28, 1907, and the careful calculation of the Auditor, that after allowing to Bray the full principal and interest on the mortgage debt, and all insurance premiums which Bray's account (of which more hereafter) asserts were paid, and full interest on each of such premiums, and crediting only the awards made to Bray in previous audits, on October 5, 1907, the balance due to Bray was $603.47. We further find that on a partial re-statement of Account U (called U No. 2), pursuant to an *agreement* between the counsel of Bray and Morgan (the only creditors then before the Court). Bray is allowed (in U No. 2) $1,094.71, instead of the auditor's true balance as above of $603.47. An excess of $491.24.

These figures (which are not ours but made by the auditor) we submit demonstrate that all obligations *secured* by the mortgage have not only been paid, but overpaid, and the lien of the mortgage consequently *extinguished*.

How it may well be asked in that state of circumstance, can Bray attempt to set up any further lien in this estate?

We answer that the attempt is made in the following fashion:

The auditor being about to state an account of the amount, $5,212.59, reported by the trustees July 17, 1906, as in hand, Bray, on August 1, 1906, seeking to swell his claim beyond the amount *properly due under the mortgage,* procured from Mrs. Williams and her son, then in New York, the promissory note professing to be "secured by mortgage filed in the case of *Latrobe* v. *Winans,*" for $7,276.44 "to-

gether with interest thereon from January 1, 1906, the said amount being in liquidation of a loan of said Thomas Sprackman Bray, *together with certain proper charges and expenses in connection therewith."*

On this note suit was brought in the Superior Court, August 30th, and on the *same day* a judgment by confession for $7,566.31 was entered, which was for the face of the note and interest from January 1, 1906.

This judgment filed September 7, 1906 (headed *"mortgage claim"*), is the claim referred to in the Court's order page 125, wherein the auditor is directed to allow to Bray "the balance in full of his claim *filed September 7, 1906."*

When we refer to the account of the mortgage indebtedness filed by Bray we are not left to doubt or conjecture as to how the amount of the said note is made up.

That account being the statement of Hardy and Jewson, the original mortgagees, and of Vaughan, the intermediate assignee, down to January 1, 1906 (the date from which the note counts), shows *with* all the charges, good and bad therein, a balance of £1,499.7-7 (sterling) which, at the rate of exchange of $4.85 and a fraction per pound sterling, gives precisely the amount of the promissory note $7,276.44.

This is not a *mere* coincidence of amounts and accounts to the specified date (January 1, 1906), but it shows beyond a doubt that the note was computed *on* that account, and that the note includes, and was *intended* to include all the *items* of that account as *"proper* charges and expenses" (as the note states it), under the mortgage.

Turning to that account, we find that in addition to the *legitimate* charges *secured* by the mortgage, of Principal and Interest and Insurance Premiums, the professional charges, first of Barton & Wilmer, then of Hardy & Jewson, then of Vaughan, amounting to £164-2-1 with interest thereon for many years added, are entered as lawful charges under the mortgage. We find also, that beginning with 1901, there are annual rests in the account, and interest *compounded* on the annual balances. It goes without saying

that these items are not proper items or *secured* by the mort-gage. Comparing now this account with the computation of the auditor in Account U, in which *only* these illegal charges are *rejected,* and where *simple,* not *compound* interest is com-puted, we see that the said improper items and the *com-pounding* of interest make up the difference between Bray's account and that of the auditor.

This difference is the balance of his claim *filed on the judg-ment, September 7, 1906,* which the Court directs the auditor to award to Bray in full.

The claim of Bray as shown by the record, separates itself into two parts, namely :° (*a*) The items properly covered by the mortgage. As to these items, his claim as to date of mort-gage, time of recording, time of filing the petition Septem-ber 20, 1901, is before all the other claims and no objections can be made to its *priority.* That portion of the claim how-ever, as we have shown has been *paid;* but (*b*) As to the other portion of Bray's claim, namely, the above mentioned excess or balance not covered by the mortgage, but simply incorporated into a judgment, we insist—

That this judgment can in no way, even by execution (and there was no execution), have or gain a priority over the prior recorded mortgages of the appellants; either as to realty or personalty.

The reason for this is that the judgment creditor stands in the shoes of the debtor; can get nothing but that which the debtor can in conscience give, and is, therefore, subject to all the equities of the prior incumbrancer, even if the prior incumbrance is defective, which ours is not.

Even where the thing assigned is a mere fund or chose in action, no notice to the custodian of the fund is necessary to defeat the judgment creditor. This is well settled, both in England and this country. *Pomeroy's Equity,* 3d Edition, Vol. 2, sec. 694, and numerous cases cited. *Bispham's Prin-ciples of Equity,* 2d Edition, sec. 168, page 222; *Dyson* v. *Symons,* 48 Md. 215, where the English and American cases are reviewed; *Valentine* v. *Seiss,* 79 Md. 180, at page 190;

*Noble* v. *Oil Co.,* 79 Penna. State, 354. Where an assignment of a chose in action prevailed over a foreign attachment laid before notice of the assignment was given to the garnishee. *Scott* v. *Lord Hastings,* 4 K. & J. 633. A strong case directly in point, where an assignment of *stock* held in *trust* was, by Vice-Chancellor Wood, preferred to a judgment, although a "stop order" in chancery had been obtained by the judgment creditor *before* notice of the assignment was given to the trustee.

"A judgment is not an *assignment.* One is the act of the party, the other the act of the law." *Breading* v. *Boggs,* 20 Penna. State, 33.

The Court did not pass on the figures or amount of Bray's claim. It expressly declined to do so on the ground that it was dealing only with priorities, and determining what claims should come in.

The only claim of Bray, filed September 7, 1906, was the judgment. This judgment, as an independent claim, has no place in this case, ahead of any assignment. Yet the Court, by its order, erroneously grants a preference to this judgment as such independent claim.

*Randolph Barton, Jr.,* and *Aubrey Pearre, Jr.,* for J. Pierpont Morgan, appellee.

These several claims being mere *assignments* of a chose in action took effect as among the various assignees from the date at which they were respectively perfected by notice to the debtor (the trustees), and that notice was given by filing these claims in the Court proceeding and obtaining proper orders of Court whereby the rights of such assignees were to be protected.

Consequently, the appellants having taken no step to advise the trustees of their holding such assignments until after appellees had, by due diligence, done so, are subordinated in position to the claims of all assignees who did take such steps and give such notice.

It being necessary, to perfect an assignment of a fund, to give notice to the debtor, if the fund is held by a trustee notice to the trustee is necessary. When the fund is being administered in Court, notice of the assignment must be given to the Court—that is, the assignment must be filed in the case, the assignee made a party defendant, as was done with the Morgan claim, or in some other way calling the attention of the Court to the assignment.

This is analagous to the English practice of obtaining a "stop order" on the fund. In England the trust fund is deposited with the registry and the assignee of the equitable interest comes into Court and obtains a "stop order" on the registry paying out the money. A trustee is merely the agent or hand of the Court and is bound to act as the Court may direct; his bond is conditioned on his performance of the trust according to the orders of the Court. If sufficient and proper notice could be given the trustee by merely casually mentioning to him that an assignment of the fund had been made, or even by giving him formal personal notice of such a fact, then there would arise great conflict of claims and confusion in general. After receiving notice of an assignment, the trustee must hold for the assignee, as we have already noticed, and yet, at the same time, being subject to the orders of the Court in which he was administering the trust, he must hold the fund for the benefit of those named by the Court—a great conflict of claims would immediately arise. A trustee paying money according to an order of Court might subject himself to numerous suits by all who gave him notice and who had never become parties to the trust proceeding, because, irrespective of the power of the trustee given him by the instrument creating the trust, as soon as the trust is submitted to the jurisdiction of the Court, the powers of that trustee are thereby surrendered to the Court.

And so, also, if a trustee should be bound by the Land. Records, a re-investment of this trust estate might be in Pennsylvania lands, and yet according to the argument of the appellants, one who records his assignment in the Balti-

more City Land Records has the preference over one who comes into the equity proceeding. Their theory would lead them to say that if all the land were sold by the trustees and re-invested in railroad bonds, still the Land Records would control, "as there was no intention to convert." The interest of Mrs. Williams is not any sort of an interest in real estate.

And in England we find that where a fund is in Court, a stop order is required *"to enable an assignee to complete his title"*—the fund is in Court, and not subject to the control of the trustees. (1884), *Mutual Life Ins.* v. *Langley,* L. R. 26 Ch. Div. 690. This case has been followed: *Mack* v. *Postle,* L. R. (1894), 2 Ch. 455; *Stephens* v. *Green,* L. R. (1895), 2 Ch. 155, 159; *Lloyds Bank* v. *Pearson,* L. R. (1901), 1 Ch. 865.

The latter case is especially in point, for there *land* was devised on trust to sell and pay the income to X for life and on her death to divide the proceeds among her children, one being P who was then also one of the trustees. During the life of X and before the land was sold, P mortgaged his share to G, but no notice thereof was given to the other trustees. P then, concealing the first mortgage, made a second mortgage to the plaintiffs, who gave notice of this mortgage to the other trustees, and it was held that they have priority over G, P being fraudulent and his notice not being imputable to the other trustees.

In *Mack* v. *Postle* (*supra*), a later assignee coming into Court and obtaining a stop order is preferred to a prior assignee who actually gave notice to the trustees, but obtained no stop order.

"If the fund is not in the hands of the trustee, but has been brought into Court in a suit, then I apprehend that a stop order has been substituted for notice to the trustee." *Elder* v. *Maclean,* 3 Jur. (N. S.) 283, 284.

There was an attempt to show that Mr. Morgan had actual notice of the claim of Lambert & Cooper, by the testimony of General Stewart Brown. This testimony was, however, of a very general character and not at all definite, and, we sub-

mit, under the authorities, not legally sufficient to impute actual notice to Mr. Morgan.

On looking at the varius proceedings in the case, we find:

(*a*) That various assignees of the income from time to time became parties to the case, claiming to be assignees, not of part of the income, but of the *entire* income to the extent of their claims. In other words, these assignees claimed, not as *general* creditors, but as *preferred* creditors, having various orders of priority. They constituted "classes of creditors" such as are referred to in *Marine Bank* v. *Heller,* 94 Md. 219.

(*b*) That the auditor and the Court recognized these various creditors and from time to time made allowances on their respective claims, according to the order in which the Court found that they were respectively entitled to priority.

(*c*) That when "Auditor's Account U" was stated on September 28, 1907, the auditor allowed a certain amount of Bray's claim and the net balance in hand to Morgan on account of *his* claim, the exact amount whereof is stated by the auditor.

(*d*) That Bray being dissatisfied because of the failure to allow *all* his claim, filed exceptions as a result of which an agreement was filed resulting in the final ratification of Account U, "except as to the *allowances* to Bray and Morgan." In other words, the *amount* of Morgan's claim, as ascertained by the auditor in Account U, was judicially decreed by the ratification of that account.

(*e*) That thereupon, in pursuance of the agreement, which was "that the papers in this case shall be referred back to the auditor to state an account dividing equally all balance of income between said Bray and said Morgan, *on account of their respective claims, subject to the usual exception,"* which agreement the Court approved the auditor did state a supplementary account (U No. 2) referring therein to the order of the Court approving the said agreement.

(*f*) That this account was on October 14, 1907, ratified *nisi,* and on October 25, 1907, was finally ratified.

Now we submit that this allowance to Morgan, "on account of his claim" (the amount of which claim had already been fixed by ratification of account U) could not have been made without judicially deciding that Morgan and Bray between them, were entitled to the *entire* residue of income. In other words that they had *priority* over all other persons to whom allowances were not made.

For instance, the claims of Hotel Rennert and Union Deposit Bank were already in the case and before the Court. No allowance whatever was made to them. The allowance of *all* to Morgan and Bray, therefore, necessarily went upon the ground that they were not *pari passu* with these other creditors, but that they were a *special class of creditors,* a class thus judicially found to be entitled ahead, not only of the other creditors in the case, but of any one else, as to the balance of income thus available for distribution. On no other principle could Morgan and Bray be given the entire balance and these other creditors excluded. And *every* point which is essential in order to support the action of the Court becomes *res adjudicata. Trayhern* v. *Colburn,* 66 Md. 277; *Whitehurst* v. *Rogers,* 38 Md. 503; *Barrick* v. *Horner,* 78 Md. 253.

Now suppose, *thereafter,* the Union Deposit Bank, for instance, had tried to question a further preference and payment of Morgan. On what ground could it have done so? "The plea of *res adjudicata* applies, except in special instances, not only to the points upon which the Court was required to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation and which the parties even using reasonable diligence might have brought forward at the time." *Marine Bank* v. *Heller,* 94 Md. 217.

Certainly the appellants, who stood by for seven years and allowed the Court to decide these questions at the instance of the vigilant creditors, are not, on at last coming into the case, in a better position than those who had already acted in the matter. To give them such advantages would encourage par-

ties to remain inactive, and even purposely to hold back their claims. As we have seen, so far from permitting this, the Courts while allowing, *where possible,* dilatory claimants to come in, have never *rewarded* them for doing so, but have insisted, as one of the conditions of admitting them, that their admission shall not disturb questions already settled. See cases already cited in *Miller "Equity,"* section 544; *Trayhern* v. *Bank,* 57 Md. 590.

*George Weems Williams* and *William Pepper Constable,* for the Union Deposit Bank, Limited, of London, appellee.

In substance, most of the cases hold that the *bona fide* assignee for value who first gives notice of his assignment perfects his assignment, binds the fund in the control of the trustees, and is entitled to priority in payment over any other assignment. The English case of *Dearle* v. *Hall,* 3 Russell, 1, is probably the leading authority on this subject. The facts were: A person having a benefical interest in a sum of money invested in the names of trustees assigned it for a valuable consideration to one person, but no notice of the assignment was given to the trustees; afterwards the same beneficiary proposed to sell his interest to another, and the latter, having made inquiry of the trustees as to the nature of the vendor's title and the amount of his interest, and receiving no intimation of any prior incumbrances, completed the purchase and gave the trustees notice. See also *Meux* v. *Bell,* 1 Hare, 73; *Timson* v. *Ramsbottom,* 2 Keen, 35; *In re Freshfield's Trust,* 11 Ch., Div. 198; *Lloyds' Bank* v. *Pearson,* L. R. 1901, 1 Ch. 865; *Washburton* v. *Hall,* Kay's Reports, 470, 478; *Elder* v. *McLean,* 3 Jur. 1 N. S. 283; *Addison* v. *Cox,* 8 Ch. App. Cas. 76; *Saffron Society* v. *Rayner,* 14 Ch., Div. 406; *English Trust* v. *Brunton,* (1892) 2 Q. B. 1, 8.

The Circuit Court of Appeals, 2d Circuit (1895), in *Methven et al.* v. *Staten Island, etc., Co.,* 66 Fed. Rep. 113, held that where two assignments of a chose in action for valuable consideration are made to different persons, the as-

signee who first gives notice of his claim to the debtor has the prior right, though the assignment to him is later in date than that to the other assignee. The Court says: "In England, since the cases of *Dearle* v. *Hall,* 3 Russ. 1 and *Loveridge* v. *Cooper,* Id. 30, it has been the settled doctrine that the assignee who first gives notice to the debtor obtains priority. This is in obedience to the general principle which requires that all transfers of property must be rendered as complete as the nature of the action will permit, in order to make them valid as against subsequent bona fide purchasers for valuable consideration without notice. Many of the adjudications in this country adopt that doctrine." * * * "As we understand the judgments of the Supreme Court of the United States in *Judson* v. *Corcoran,* 17 How. 612, and *Spain* v. *Hamilton's Adm'r.,* 1 Wall, 604, they approve the doctrine of *Dearle* v. *Hall,* and *Loveridge* v. *Cooper.* These cases are cited and impliedly followed by the Supreme Court in each opinion."

See also—*Laclade Bank* v. *Schuler,* 120 U. S. 511; *Third Nat. Bk.* v. *City,* 126 Fed. Rep. 413; *The Elmbank,* 72 Fed. Rep. 610; *In re Gillespie,* 15 Fed. Rep. 734.

One of the leading State cases is *Phillips' Estate (No. 2),* 205 Pa. 515, in which the Court decides that as between successive assignments of a fund in the hands of a third person, the one which being acquired without notice of prior ones is first brought to the knowledge of the depository is entitled to priority. See also—*Weed* v. *Boutelle,* 56 Vt. 570; *Hobson* v. *R. R. Co.,* 1 Tenn. Ch. 203; *McWilliams* v. *Webb & Son,* 32 Ia. 577; *Murdock and Dickson* v. *Finney,* 21 Mo. 138; *Houser* v. *Richardson, Adm.,* 90 Mo. App. 134, 140 (1901); *Graham Co.* v. *Pembroke,* 124 Cal. 117; *Bank* v. *Ins. Co.,* 17 App. D. C. 113, 124; *Peabody* v. *Lewiston,* 83 Me. 286; *Copeland* v. *Manton,* 22 Ohio St. 398, 401.

If the recordation of the instruments transferring Mrs. Williams' interest in the trust estate did not give constructive notice, then the bank is entitled to priority in payment ahead of the assignments of Messrs. Lambert and Cooper and

Dixon, inasmuch as the assignment was bona fide for value, and notice was given first to the trustees of its assignment through the instrumentality of the Court. The equity of the bank is therefore of a superior nature to the equities of Lambert and Cooper and Dixon. The bank advanced the money to the life tenant on the faith of the estate as security, and gave proper notice of the security thus taken to the trustees, who were the legal depositories of the fund. The fund was thus bound in their hands for the benefit of the bank, and the holders thereof were in legal effect converted into trustees for the bank for the sum assigned as soon as it was in their possession, free from the payment of prior superior assignments. The assignments of Messrs. Lambert and Cooper and Dixon are subordinated to that of the bank, and the equity of the bank is superior and must prevail, because the bank was vigilant and notified the trustees of the assignment in due course and perfected its lien on the fund. The appellants were negligent in not giving the notice to the trustees and permitting almost seven years to elapse without any notice to the trustees, thus affording the life tenant an opportunity to offer her estate repeatedly as security for loans.

The trust estate, judging from the amount of income derived, consists of more personalty than realty. The terms of the trust give the trustees full, complete and unlimited power in the management of the trust property. The trustees are authorized, and, as we shall see later, directed to sell the trust property as it existed at the time of the death of the testator and to invest and reinvest the proceeds of sales.

The instruments filed in behalf of Messrs Lambert and Cooper and Albert Dixon purport to be mortgages on the interest of the life tenant in the estate of DeWitt Clinton Winans, deceased, together with the rents, profits and issues arising out of that estate. At the most, these instruments, even if construed as technical mortgages, would only give constructive notice as to the real property, because the law only provides for the recordation of mortgages of personal property when the mortgagor remains in actual physical posses-

sion of the mortgaged property.  Code, Article 21, sections 29, 41.

Mrs. Williams is entitled, under the will of Mr. Winans, to receive the income from the trust estate, that trust estate being composed of personalty, and (assuming there has been no conversion) realty, and all of it subject to sale and reinvestment by the trustees.  She does not occupy the position of a *cestui que trust,* entitled to receive the rents, issues and profits from a definite piece of land, say Blackacre.  Such a *cestui que trust* would have an equitable interest in Blackacre.  Mrs. Williams, however, has only a money interest.  It is simply a coincidence that part of the trust estate happened to be real estate at the time of the execution of the instruments in question.  Her interest being a money interest, she cannot mortgage it as realty.  But when we come to consider the terms and provisions of Mr. Winans' will it is apparent that the realty devised thereunder should be considered as personalty under the well-established doctrine of equitable conversion. *Stake* v. *Mobley,* 102 Md. 408.

A reading of the will shows that the initial trust is one of sale, and while too much importance should not be attached to the position of this clause in the will, it is fair to infer therefrom that the thought uppermost in the mind of the testator was the direction to his trustee to sell all his property and convert the same into money.  It is also to be noted that the direction to sell is mandatory, although the time, terms, manner and conditions of sale are in the discretion of the trustee.

This clause, while it shows that the draughtsman of the will and the testator were familiar with the doctrine of equitable conversion, makes it manifest that they were apprehensive of the rule laid down in a number of English decisions, that where an annuity of a certain amount is charged on the estate, as was done by the testator in this will, the income of which is insufficient to pay the said annuity, the Courts will under certain circumstances authorize the sale of the corpus or a part thereof to make good the deficiency.  This rule was recognized by this Court in *Homer* v. *Landis,* 95 Md. 320.

See also as applications of the rule, *In re Mason,* 8 Ch. Div. 411; *Carmichael* v. *Gee,* 5 App. Cas. 588; *Pearson* v. *Helliwell,* 18 Eq. 411.

It is clear that the testator did not intend to say that the doctrine of equitable conversion should not apply so as to convert all his realty into personalty from the date of his death, but he declared, with the rule laid down in the above cases in his mind, that the corpus should not be liable if unproductive, to make good either the annuity to Charles E. T. Williams charged upon the estate or to be used as income.

The fact that in the will under consideration not only real but personal property was devised and bequeathed to the trustee does not prevent the application of the doctrine of equitable conversion, nor does the fact that the time, manner and terms of sale are left to the discretion of the trustee. *Stake* v. *Mobley, supra; Church Ex. Soc.* v. *Smith,* 56 Md. 362; *Sloan* v. *Safe Dep. Co.,* 73 Md. 239; *Reiff* v. *Strite,* 54 Md. 298; *Given* v. *Hilton,* 95 U. S. 591; *Doughty* v. *Bull.* 2 P. Wms. 320; *Phelps* v. *Pond,* 23 N. Y. 69; *Philadelphia's Appeal,* 112 Pa. 470; *Clark* v. *Denton,* 36 N. J. Eq. 419; *Wayne* v. *Fonts,* 108 Tenn. 145; *Smith's Estate,* 4 Phila. 181; *Bell* v. *Bell,* 25 S. C. 149; *Carr* v. *Branch,* 85 Va. 597; *Hancox* v. *Wall,* 28 Hun. 214; *Martin* v. *Spurrier,* 23 Ohio Cir. Ct. 110; *Ford* v. *Ford,* 70 Wis. 19.

If we are right in our contention that by the terms of Mr. Winans' will an equitable conversion of the real property left in trust was effected, then Mrs. Williams had no interest in the estate which can or could be regarded as realty, and, accordingly, when she mortgaged her interest to the appellants, no matter how formal those instruments were by which she attempted to do so, in the mistaken idea that she had an interest in the nature of real property, and those instruments were executed and recorded on that erroneous theory, their recordation did not create a lien or give constructive notice.

The facts and the decision in the case of *re Freshfield's Trust,* 11 Ch. Div. 198, are analogous; Allan Freshfield, who

was equitably entitled to a share of the residuary estate be-
queathed by the will of his Uncle Frederic Freshfield, mort-
gaged the same to his brother to secure the repayment of a
loan with interest. No notice of this assignment was given by
the brother to the trustees of the will of the uncle. Allan died
in 1874 and left all his estate to his wife Mary, whom he ap-
pointed executrix. The executrix deeded her interest to one
Hulm. Hulm had at that time no notice of the prior assign-
ment and gave notice to the trustees of Frederic Freshfield's
will of his claim prior to the trustees of the will of the brother
who had since died. The Court held that the transfers were
assignments of choses in action and governed by the law re-
lating to assignments.

*Lloyd's Bank* v. *Pearson, supra,* is in point. Land was
settled upon trusts to sell the same and pay the income to
Mrs. Pearson for life, and after her death to divide the pro-
ceeds among her four children. One of the sons in the life-
time of his mother and before the land was sold, mortgaged
his share to one Grinyer. The son subsequently (concealing
the mortgage to Grinyer) mortgaged his share to the plain-
tiff, who made inquiry of the trustee as to prior incum-
brances, and the bank gave notice of its own mortgage to the
trustees.

The question for decision was whether Grinyer's securi-
ties, which were prior in time, took precedence of the charge
of the plantiff's bank. The Court held that, although the
land had not yet been sold and though all the securities pur-
ported to deal with land, and not with money, the bank was
entitled to priority over the mortgage of Grinyer. The rea-
sons given therefor were that the mortgages on the property
were only assignable *choses in action,* and that the bank was a
*bona fide* assignee for value whose assignment was known
first in point of time by the trustees.

So in the case of *Wood* v. *Reeves,* 23 S. C. 382, it was
held that a person who under a will was entitled to a certain
portion of the proceeds of the sale of land provided for in
said will has a purely money interest in an estate of land,

which he can assign and transfer, but the record of such assignment would not be notice to the purchaser of the property.    See also—*Horst* v. *Dague,* 34 Ohio, 371; *Gray* v. *Smith,* 3 Watts (Pa.), 289.

*Stuart S. Janney* (with whom was *A. C. Ritchie* on the brief), for Thomas Sprackman Bray, appellee.

Briscoe, J., delivered the opinion of the Court.

The appeal in this case is taken from an order of the Circuit Court of Baltimore City, passed on the 24th of September, 1908, overruling exceptions of the appellants, to Income Account V, filed in the case of *Osmun Latrobe et al.* v. *Mathilde F. Winans et al.,* distributing the income of the trust estate of DeWitt Clinton Winans, deceased, among the creditors of Ellen Barbara Williams, one of the life tenants. The exceptions of Thomas S. Bray, a judgment on mortgage creditor of the life tenant, were sustained.

The Court below by the order appealed against directed the account to be re-stated and the fund in the hands of the trustees to be distributed in payment of the claims of the appellees, as follows:

(1) To J. Pierpont Morgan, the balance in full of his claim, as filed in the case, on December 21, 1901.

(2) To Hotel Rennert Company, in full for claim filed in above case on June 22, 1905.

(3) To Thomas Sprackman Bray, the balance in full or his claim as filed in the above case, on September 7, 1906.

(4) To the Union Deposit Bank, Limited, of England, on acount of claims filed in the above case on March 9, 1907.

The appellants and appellees are mortgage creditors of the life tenant, and there is no dispute as to the validity of these claims, but the questions involved relate to their rights and priorities of lien, in the distribution of the fund held by the trustees.

The fund in Court for distribution amounts to the sum of $3,487.56 and is income of the trust estate of DeWitt Clin-

ton Winans, deceased, collected by the trustees and payable
to Mrs. Ellen Barbara Williams, as life tenant, under the
will.

Mr. Winans died in 1892, leaving a last will and testament
wherein he directed his trustees after the death of his wife
to pay the whole of the income of his residuary estate, held
by the trustees, to Ellen Barbara Williams during her life,
with remainders to third persons. On the 7th day of Decem-
ber, 1895, the Circuit Court of Baltimore City assumed
jurisdiction of the administration of the trust estate. Mrs.
Winans died shortly after the testator, and it is conceded
that Mrs. Williams is the sole life tenant and is entitled to
the payment of the income from the estate.

There are six claimants to the fund or income now in
Court for distribution and each claim is represented by a
mortgage transferring and assigning the interest of the life
tenant in the estate as security for loans made to her.

It is contended, upon the part of the appellants, that the
execution and recording of their mortgages being prior in
date gave them a prior lien and no further notice by them
or action on their part was necessary to perfect their lien.

The appellees contend that the transfers were assignments
of a fund, to wit, income accruing in the hands of trustees
from the trust estate and payable to Mrs. Williams, and to
render such assignments a complete transfer of her interest
in the trust estate, to effect a prior lien on the fund, notice
of these assignments to the trustees was necessary.

The dates of execution, recordation and filing of the vari-
ous mortgage claims in controversy appear to be as follows:

| NAMES. | Date of Execution. | Date of Recordation. | Date of Filing. |
|---|---|---|---|
| J. Pierpont Morgan | May 3, 1901 | May 22, 1901 | Dec. 27, 1901 |
| Hotel Rennert Company | Nov. 5, 1904 | Feb. 17, 1905 | June 22, 1905 |
| Thomas S. Bray | Oct. 15, 1896 Judgment on claim liqui- dated in 1906 | ...... ...... | Sept. 7, 1906 |
| Union Deposit Bank, Ltd., of London, England | Nov. 1, 1904 | Nov. 28, 1904 | March 9, 1907 |
| Lambert & Cooper | May 15, 1900 | July 9, 1900 | Dec. 11, 1907 |
| Albert Dixon | Feb. 19, 1902 | March 7, 1902 | Dec. 13, 1907 |

The fund in Court for distribution is the income of the trust estate from July 1, 1907, to January 1st, 1908, derived from interest on railroad bonds, Baltimore City stock and rents collected from real estate and payable to the life tenant under the will.

The Court below held, by its order of September 24, 1908, in effect, that the claims here in controversy were mere assignments of a fund or choses in action, to wit, the income in a trust estate, enjoyed by the life tenant, and that they took effect as among the assignees from the date they were perfected by notice to the trustees, and that notice was given by filing the claims in the Court proceeding and procuring proper orders thereon.

The rule thus applied in the distribution of the fund or income, in this case—that is, that the assignee who first gives notice to the debtor obtains priority—is approved and settled by numerous adjudications of the Courts, both in this country and in England.

The cases of *Dearle* v. *Hall,* 3 Russ. 1, and *Loveridge* v. *Cooper,* 3 Russ. 30, are directly in point. The LORD CHANCELLOR there said: "In cases like the present the act of giving the trustee notice is, in a certain degree, taking possession of the fund; it is going as far towards equitable possession as it is possible to go, for, after notice given, the trustee of the fund becomes a trustee for the assignee who has given him notice."

The English rule has been approved and followed by the Federal Courts. *Judson* v. *Corcoran,* 17 Howard, 612; *Spain* v. *Hamilton,* 1 Wall. 604; *Laclade Bank* v. *Schuler,* 120 U. S. 511; *Methven* v. *Staten Island,* 66 Fed. R. 113; *Third Nat. Bk.* v. *City,* 126 Fed. Rep. 413.

In 2 *Story's Eq.* section 1047, it is said, as the assignee is generally entitled to all the remedies of the assignor, so he is generally subject to all the equities between the assignor and his debtor. But in order to perfect his title against the debtor it is indispensable that the assignee should immediately give notice of the assignment to the debtor, for otherwise a priority

of right may be obtained by a subsequent assignee, or the debt may be discharged by a payment to the assignor before such notice. The same doctrine is also stated in 2 *Pomeroy's Eq. Jurisprudence,* sections 695 and 698. And in *Robinson* v. *Marshall,* 11 Md. 251, this Court approved the doctrine laid down by these eminent text-writers, and held that the assignee of a claim or chose in action cannot recover from the original debtor who had paid it to the assignor after, but without notice of, the assignment.

While some of the State Courts hold to the contrary, we think the doctrine sanctioned by the English Courts, approved by the Federal Courts and by many of our State Courts, is based upon sound reasoning and sustained by the weight of authority.

But it is earnestly contended that Mrs. Williams had at the time of the execution of the mortgages in question such an interest in the trust estate as she could mortgage, and their recordation gave constructive notice to everyone as to the priority of the liens thereunder. It will be seen, however, that the trust property in this case—"the income arising out of the residuary estate"—was but a money interest and could not be mortgaged as realty. The instruments, being mere assignments of the fund, were not within the provision of our Registry Act and their recordation could give no greater effect than the law itself gave.

In *Glenn* v. *Davis,* 35 Md. 208, the Court held, when an instrument is not entitled by law to be recorded, placing it on record could not of course operate as constructive notice.

In *Burch* v. *Taylor,* 152 U. S. 634, it is said: "It is alleged that the assignments and transfers, under which the defendant claims, were recorded in the Land Office. The argument seems to be that the defendant and his assignors selected filing and record in that office as a means of giving notice to other parties of their rights, and that having made such selection was equivalent to an admission that they would accept a like filing and record as notice to them; but that argument cannot be sustained. The defendant and his assignors may

have desired to give as much publicity as possible to the fact of the transfers to themselves, and in seeking to give such publicity may have selected the filing and record in one of the principal offices of the county as a means thereto, but they did not thereby create a new law in respect to notice. They never in terms declared, and their own acts of filing for record carried, no implied declaration of willingness to accept a similar record as notice to themselves. They had a right to rely upon the law of the State as enacted by its legislature, and were not bound by any constructive notice other than those laws provided. If notice was essential to charge them, actual notice should have been given, at least in the absence of a statute providing some means for constructive notice. *Indeed, it is a mere and not very reasonable inference from the fact that they placed these instruments on record that their purpose was thereby to give notice.*"

We think it is apparent from the terms and provisions of Mr. Winans' will that Mrs. Williams had no interest in the nature of realty thereunder, and upon the well-established principles of equitable conversion the realty must be treated as converted into personalty at the death of the testator. In the recent case of *Stake* v. *Mobley,* 102 Md. 408, this Court said, when a testator manifests a clear and unmistakable intention that real property belonging to his estate shall be sold and converted into money, it is in equity generally treated as so converted at the time of his death, in the absence of some provision or expression in the will which contemplates a postponement of the time of conversion. The general rule, "that lands devised to be sold are thereby turned into money and construed in equity as personal estate was recognized by our predecessors many years ago." *Hurtt* v. *Fisher,* 1 H. & G. 88; *Thomas* v. *Wood,* 1 Md. Ch. 296.

In this will the testator clearly intended that his real estate should be sold by his trustees, because he provides as follows:

"I give, devise and bequeath unto Osmun Latrobe (hereinafter called my trustee), now residing at Baltimore, Maryland, United States of America, all my real, personal and

mixed estate, of what nature and kind soever and whereso-
ever situated, upon trust at such time or times by public auc-
tion or private treaty, in such manner and for such price or
prices and subject to such conditions as he may think fit *to
sell* or concur with any other person or persons or part own-
ers in *selling* the whole or any part of my said real, personal
or mixed estate, to vary contracts for sale and resell, with
power to allow a portion of the purchase money to remain
upon mortgage of the premises sold; and, notwithstanding
such power of sale, I authorize my said trustee to *postpone*
the sale, calling and conversion of all or such part of my
said real in personal or mixed estate for such length of
time as he in his sole and uncontrolled discretion shall think
fit. And I declare that he shall not be liable or responsible
for any loss which may arise in consequence of the postpone-
ment of such sale."

Now, while the time, manner and terms of sale were left
to the discretion of the trustees, the fact of sale by the trus-
tees was contemplated at all events, and in such cases the
authorities are uniform in holding that this will work a
conversion of the realty at the time of the death of the testa-
tor. *Stake* v. *Mobley, supra; Sloan* v. *Safe Deposit Co.,* 73
Md. 239; *Church Extension* v. *Smith,* 56 Md. 362; *Reiff* v.
*Strite,* 54 Md. 298; *Given* v. *Hilton,* 95 U. S. 591; *Clarke*
v. *Denton,* 36 N. J. Eq. 419.

We are, therefore, of the opinion that Mrs. Williams had
no interest in the trust property, under this will, which could
be regarded as realty, and the recordation of the mortgages
did not create a lien or give such constructive notice as to
defeat the claims of the appellees, who were prior in point of
time in filing their claims with the trustees.

In *Gray* v. *Smith,* 3 Watts (Pa.), 289, it is said, where a
testator orders his lands to be sold and the proceeds distrib-
uted among certain persons, no interest in the land passes to
the legatees. They acquire under the will nothing more than
a right to receive a sum of money out of the proceeds of sale—
a mere chose in action, a claim strictly of a personal charac-

ter. Their interest, being merely a chose in action, and not a right in the real estate, is not the subject of mortgage. Such a mortgage could create no lien. *Wood* v. *Reeves,* 23 S. C. 382; *Horst* v. *Dague,* 34 Ohio, 37; *In re Freshfield's Trust,* 11 Ch. Div. 198; *Lloyd's Bank* v. *Pearson,* 1 Chan. Div. 872.

We therefore hold in this case that under the well-settled doctrine of equitable conversion, all of the trust property in this case must be treated as personalty, and that the instruments executed by Mrs. Williams, the life tenant, were simply assignments of a fund or choses in action, and fall within the principles of law stated herein.

The appellees having perfected their title to the fund by notice to the trustees, prior in time to the notice given by the appellants, they are entitled to priority of payment out of the fund in Court.

In *Dearle* v. *Hall,* 3 Russ. 12, SIR THOMAS PLUMMER, M. R., says: "Wherever it is intended to complete the transfer of a *chose in action,* there is a mode of dealing with it which a Court of Equity considers tantamount to possession—namely, notice given to the legal depository of the fund. Where a contract respecting property in the hands of other persons, who have a legal right to the possession, is made behind the back of those in whom the legal interest is thus vested, it is necessary, if the security is intended to attach on the thing itself, to lay hold of that thing in the manner in which its nature permits it to be laid hold of—that is, by giving notice of the contract to those in whom the legal interest is. By such notice, the legal holders are converted into trustees for the new purchaser, and are·charged with responsibility towards him; and the *cestui que trust* is deprived of the power of carrying the same security repeatedly into the market and of inducing third persons to advance money upon it, under the erroneous belief that it continues to belong to him absolutely, free from incumbrance, and that the trustees are still trustees for him, and for no one else. That precaution is always taken by diligent purchasers and incumbrancers; if it is not

taken, there is neglect; and it is fit that it should be understood that the solicitor who conducts the business for the party advancing the money is responsible for that neglect. The consequence of such neglect is, that the trustee of the fund remains ignorant of any alteration having been made in the equitable rights affecting it; he considers himself to be a trustee for the same individual as before, and no other person is known to him as his *cestui que trust.* The original *cestui que trust,* though he has in fact parted with his interest, appears to the world to be the complete equitable owner, and remains in the order, management and disposition of the property as absolutely as ever; so that he has it in his power to obtain, by means of it, a false and delusive credit. He may come into the market to dispose of that which he has previously sold; and how can those, who may chance to deal with him, protect themselves from his fraud? Whatever diligence may be used by a *puisne* incumbrancer or purchaser—whatever inquiries he may make in order to investigate the title and to ascertain the exact state of the original right of the vendor and his continuing right—the trustees, who are the persons to whom application for information would naturally be made, will truly and unhesitatingly represent to all who put questions to them that the fund remains the sole absolute property of the proposed vendor. These inconveniences and mischiefs are the natural consequences of omitting to give notice to trustees; and they must be considered as foreseen by those who, in transactions of that kind, omit to give notice; for they are the consequences which, in the experience of mankind, usually follow such omissions. To give notice is a matter of no difficulty; and whenever persons, treating for a *chose in action,* do not give notice to the trustee or executor, who is the legal holder of the fund, they do not perfect their title; they do not do all that is necessary in order to make the thing belong to them in preference to all other persons; and they become responsible, in some respects, for the easily foreseen consequences of their negligence."

There were other subordinate questions argued and pre-

sented at the hearing of this case, but as they do not affect the conclusion we have reached they need not be discussed.

For the reasons given, the order appealed from will be affirmed.

*Order affirmed, with costs.*