# Hobbs and others *against* Fogg.*

A negro, or mulatto, is not entitled to exercise the right of suffrage, at the general election, under the existing constitution and laws of Pennsylvania.

WRIT of error to the common pleas of *Luzerne* county.

This was an action on the case, brought in the court below, by William Fogg, the defendant in error, against the plaintiffs in error, Hiram Hobbs, inspector, and Levi Baldwin, John Miller, and Uriah A. Gritner, judges, of the general election, held in the county of Luzerne, on the 13th of October 1835.

The plaintiff below was a coloured man, either a negro or mulatto, and, it would seem, brought this action, for the purpose of establishing a right, which he claimed to have, of voting at the general election, held in the county where he resided, for governor and other officers, as a citizen and freeman of the state, according to the provision in this behalf, contained in the constitution and laws.

The declaration set forth the election of Hiram Hobbs, by the electors of the township of Greenfield, in the county of Luzerne, on the 2d day of October 1835, as an inspector for the then ensuing general election, about to be held on the 13th of the same month; his acceptance of the office; also the due appointment of the other plaintiffs in error, as judges of the said general election; their acceptance of the office; and that they all, accordingly, acted in and exercised their respective offices, at and during the said general election; when and where the defendant in error, being one of the freemen, and citizens of the commonwealth of Pennsylvania, and having resided within the said commonwealth for two years next before said election, in the township of Greenfield; and being also above the age of twenty-one years, and having paid a county tax, assessed at least six months before the said election, all which being made known to the plaintiffs in error, he offered to vote, but they contriving, and fraudulently, and maliciously intending to injure and damnify him, the plaintiff in error, in this behalf, absolutely refused to receive his vote, and thus prevented him from doing so.

On the trial of the cause, the facts stated, by the plaintiff below, in his declaration, with the exception that his vote was fraudulently or maliciously refused; and with the addition, that the plaintiff was a negro or mulatto, were admitted. It was distinctly

* The report of this case was received too late for insertion amongst the decisions at the Sunbury term, to which it appertains.

VI.—3 U

[Hobbs and others v. Fogg.]

admitted by the plaintiff below, that there was no express malice on the part of the defendants below, in refusing to receive his vote; and that he was a free negro or mulatto.

There being no controversy between the parties, as to the facts of the case, the president judge (Scott) charged the jury as follows: "This suit is brought for the purpose of ascertaining the political rights of the man of colour in Pennsylvania. The defendants insist, 1st, that even supposing the plaintiff was entitled to recover in any form of action, he cannot, in an action on the case. That the act of assembly gives a specific remedy, which must be pursued. Upon this point, the court charged the jury, that this is not a proceeding to recover the penalty imposed by any act of assembly, but to recover damages for a personal wrong, in being deprived of the right of suffrage by the defendants, who were officers of the election, they well knowing that he was a legal voter. Such action may be sustained, notwithstanding the penal sanction of the laws and the specific modes prescribed for enforcing them. Upon this point, the court instruct the jury, that the declaration sets forth every fact necessary, under the act of assembly, to qualify the plaintiff to exercise the rights of a voter; and that the defendants well knowing the premises rejected his vote. It is, therefore, unnecessary for the plaintiff to prove express malice; malice is implied in law.

"It is finally urged, that a free negro or mulatto is not a citizen within the meaning of the constitution and laws of the United States, and of the state of Pennsylvania, and, therefore, is not entitled to the right of suffrage. This, the court regard as the most important point in the cause; and the question, as it is avowed on the part of the plaintiff, which this suit was brought to settle.

"We know of no expression in the constitution or laws of the United States, nor in the constitution or laws of the state of Pennsylvania, which can legally be construed to prohibit free negroes and mulattoes, who are otherwise qualified, from exercising the rights of an elector. The preamble to the act, for the gradual abolition of slavery, passed on the 1st of March 1780, breathes a spirit of piety and patriotism, and fully indicates an intention in the legislature to make the man of colour a *freeman*.

"As there is no dispute between the parties, in relation to the facts in this case, and as the opinion of the court, upon the points of law, are decidedly with the plaintiff, the verdict of the jury must be in his favour, &c."

To this charge of the court, the counsel for the defendants below, excepted; and assigned the same for error in the court above.

1st. That the court erred, in charging the jury, that it was unnecessary for the plaintiff to prove express malice, in order to entitle him to recover; that malice was implied in law.

2d. That the court erred, in charging the jury, that there was no provision in the constitution or laws of this state, which can be

legally construed, to prohibit free negroes, or mulattoes, who are otherwise qualified, from exercising the rights of an elector.

The decision of the supreme court on the question, involved in the second error, rendered the expression of an opinion unnecessary in respect to the first.

*Wright* and *Conyngham,* .for plaintiffs in error, cited, as to the first error, 1 *East* 555, *note page* 563; 11 *Johns. Rep.* 114; 3 *Con.* 537; 11 *Serg. & Rawle,* 3; 3 *Eng. Com. Law* 486; 2 *Starkie's Rep.* 577. In support of the second error, *Crandall's Case,* 10 *Con.* 339; 2 *Kent's Com.* 258, *note;* 1 *Litt. Ky. Rep.* 333; *Constitution of U. S., art.* 4, *sect.* 2; *Sergeant on Const. Law* 393.

*Kidder* and *Greenough,* for defendant in error, cited, as to the first error, 2 *Ld. Raym.* 938; 11 *Mass.* 330; *Constitution of Penn. art.* 3, *sect.* 1; *Abolition act of* 1780; 2 *Kent's Com.* 258; *Sergeant on Const. Law* 393; *Vattel's Law of Nations,* 166–7; *Stroud's Purd.* 981.

The opinion of the Court was delivered by

GIBSON, C. J.—This record raises, a second time, the only question on a phrase in the constitution, which has occurred since its adoption; and however partizans may have disputed the wisdom of its provisions, no man has disputed the clearness and precision of its phraseology. We have often been called upon to enforce its limitations of legislative power; but the business of interpretation was incidental, and the difficulty was not in the diction, but in the uncertainty of the act to which it was to be applied. I have said, a question on the meaning of a phrase has arisen a second time. It would be more accurate to say the *same* question has arisen the second time. About the year 1795, as I have it from James Gibson, Esquire, of the Philadelphia bar, the very point before us was ruled by the high court of errors and appeals, against the right of negro suffrage. Mr Gibson declined an invitation to be concerned in the argument, and therefore, has no memorandum of the cause to direct us to the record. I have had the office searched for it; but the papers had fallen into such disorder as to preclude a hope of its discovery. Most of them were imperfect, and many were lost or-misplaced. But Mr Gibson's remembrance of the decision is perfect and entitled to full confidence. That the case was not reported, is probably owing to the fact that the judges gave no reasons; and the omission is the more to be regretted, as a report of it would have put the question at rest and prevented much unpleasant excitement. Still the judgment is not the less authoritative as a precedent. Standing as the court of last resort, that tribunal bore the same relation to this court, that the supreme court does to the common pleas; and as its

authority could not be questioned then, it cannot be questioned now. The point, therefore, is not open to discussion on original grounds.

But the omission of the judges, renders it proper to show that their decision was founded in the true principles of the constitution. In the first section of the third article, it is declared, that " in elections by the citizens, every FREEMAN of the age of twenty-one years, having resided in the state two years before the election, and having within that time paid a state or county tax," shall enjoy the rights of an elector. Now the argument of those who assert the claim of the coloured population is, that a negro is a man; and, when not held to involuntary service, that he is free; consequently that he is a freeman; and if a freeman in the common acceptation of the term, then a freeman in every acceptation of it. This pithy and syllogistic sentence comprises the whole argument which, however elaborated, perpetually gets back to the point from which it started. The fallacy of it, is its assumption that the term freedom signifies nothing but exemption from involuntary service; and that it has not a legal signification more specific. The freedom of a municipal corporation, or body politic, implies fellowship and participation of corporate rights; but an inhabitant of an incorporated place, who is neither servant nor slave, though bound by its laws, may be no freeman in respect of its government. It has indeed been affirmed by text writers, that habitance and paying scot and lot, give an incidental right to corporate freedom; but the courts have refused to acknowledge it even when the charter seemed to imply it; and, when not derived from prescription or grant, it has been deemed a qualification merely, and not a title. *Wilcox, chap.* 3, p. 456. Let it not be said that the legal meaning of the word freeman is peculiar to British corporations, and that we have it not in the charters and constitutions of Pennsylvania.

The laws agreed upon in England, in May 1682, use the word in this specific sense, and even furnish a definition of it. " Every inhabitant of the said province that is or shall be a purchaser of one hundred acres of land or upwards, his heirs and assigns; and every person who shall have paid his passage, and shall have taken up one hundred acres of land at a penny an acre, and have cultivated ten acres thereof; and every person that hath been a servant or bondsman, and is free by his service, that shall have taken up his fifty acres of land, and shall have cultivated twenty thereof; and every inhabitant, artificer, or other resident in the said province that pays scot and lot to the government; *shall be deemed and accounted* A FREEMAN *of the said province;* and every such person shall be capable of electing or being elected representatives of the people in provincial council or general assembly of the said province." Now why this minute and elaborate detail? Had it been intended that all but servants and slaves should be freemen

[Hobbs and others v. Fogg.]

to every intent, it had been easier and more natural to say so. But it was not intended. It was foreseen that there would be inhabitants, neither planters nor taxable, who, though free as the winds, might be unsafe depositories of popular power; and the design was to admit no man to the freedom of the province who had not a stake in it. That the clause which relates to freedom by service, was not intended for manumitted slaves, is evident from the fact that there were none, and it regarded not slavery, but limited servitude expired by efflux of time. At that time, certainly, the case of a manumitted slave, or of his freeborn progeny, was not contemplated as one to be provided for in the founder's scheme of policy. I have quoted the passage, however, to show that the word freeman was applied in a peculiar sense to the political compact of our ancestors, resting, like a corporation, on a charter from the crown; and exactly as it was applied to bodies politic at home. In entire consonance, it was declared in the act of union, given at Chester in the same year, that strangers and foreigners holding land, " according to the law of a freeman," and promising obedience to the proprietary as well as allegiance to the crown, " shall be held and reputed freemen of the province and counties aforesaid;" and it was further declared, that when a foreigner " shall make his request to the governor of the province *for the aforesaid freedom,* the same person shall be *admitted* on the conditions herein expressed, paying twenty shillings sterling and no more;" modes of expression peculiarly appropriate to corporate fellowship. The word in the same sense pervades the charter of privileges, the act of settlement, and the act of naturalization, in the preamble, to the last of which, it was said that some of the inhabitants were " foreigners and not freemen according to the acceptation of the laws of England."

It held its place also in the legislative style of enactment, down to the adoption of the present constitution; after which, the words " by and with the advice and consent of the freemen," were left out and the present style substituted. Thus, till the instant when the phrase on which the question turns, was penned, the term freeman had a peculiar and specific sense, being used like the term citizen, which supplanted it, to denote one who had a voice in public affairs. The citizens were denominated freemen even in the constitution of 1776; and under the present constitution, the word, though dropped in the style, was used in legislative acts convertibly with electors, so late as the year 1798, when it grew into disuse.

In an act, passed on the 4th of April in that year, for the establishment of certain election districts, it was, for the first time, used indiscriminately with that word; since when, it has been entirely disused. Now it will not be pretended that the legislature meant to have it inferred, that every one not a freeman within the purview should be deemed a slave; and how can a convergent intent

be collected from the same word in the constitution, that every one not a slave is to be accounted an elector? Except for the word citizen, which stands in the context, also as a term of qualification, an affirmance of these propositions would extend the right of suffrage to aliens; and to admit of any exception to the argument, its force being derived from the supposed universality of the term, would destroy it. Once concede that there may be a freeman in one sense of it, who is not so in another, and the whole ground is surrendered. In what sense, then, must the convention of 1790 be supposed to have used the term? Questionless in that which it had acquired by use in public acts and legal proceedings, for the reason that a dubious statute is to be expounded by usage. "The meaning of things spoken and written, must be as hath been constantly received." *Vaugh.* 169. On this principle, it is difficult to discover how the word freeman, as used in previous public acts, could have been meant to comprehend a coloured race. As well might it be supposed that the declaration of universal and unalienable freedom in both our constitutions, was meant to comprehend it. Nothing was ever more comprehensively predicated, and a practical enforcement of it would have liberated every slave in the state; yet mitigated slavery long continued to exist among us in derogation of it. Rules of interpretation demand a strictly verbal construction of nothing but a penal statute; and a constitution is to be construed still more liberally than even a remedial one, because a convention legislating for masses, can do little more than mark an outline of fundamental principles, leaving the interior gyrations and details to be filled up by ordinary legislation. "Conventions intended to regulate the conduct of nations," said Chief Justice Tilghman, in the Farmers' Bank *v.* Smith, 3 *Serg. & Rawle,* 69, "are not to be construed like articles of agreement at the common law. It is of little importance to the public whether a tract of land belongs to A or B. In deciding these titles, strict rules of construction may be adhered to; and it is best they should be adhered to, though sometimes at the expense of justice. But where multitudes are to be affected by the construction of an amendment, great regard is to be paid to the spirit and intention." What better key to these, than the tone of antecedent legislation discoverable in the application of the disputed terms?

But in addition to interpretation from usage, this antecedent legislation furnishes other proofs that no coloured race was party to our social compact. As was justly remarked by President Fox, in the matter of the late contested election, our ancestors settled the province as a community of white men; and the blacks were introduced into it as a race of slaves; whence an unconquerable prejudice of caste, which has come down to our day, insomuch, that a suspicion of taint still has the unjust effect of sinking the subject of it below the common level. Consistently with this prejudice, is it to be credited that parity of rank would be allowed to

such a race? Let the question be answered by the statute of 1726, which denominated it an idle and a slothful people; which directed the magistrates to bind out free negroes for laziness or vagrancy; which forbade them to harbour Indian or mulatto slaves, on pain of punishment by fine, or to deal with negro slaves, on pain of stripes; which annexed to the interdict of marriage with a white, the penalty of reduction to slavery; which punished them for tippling, with stripes, and even a white person with servitude for intermarriage with a negro. If freemen, in a political sense, were subjects of these cruel and degrading oppressions, what must have been the lot of their brethren in bondage. It is also true, that degrading conditions were sometimes assigned to white men, but never as members of a caste. Insolvent debtors, to indicate the worst of them, were compelled to make satisfaction by servitude; but that was borrowed from a kindred and still less rational principle of the common law. This act of 1726, however, remained in force till it was repealed by the emancipating act, of 1780; and it is irrational to believe that the progress of liberal sentiments was so rapid, in the next ten years, as to produce a determination in the convention of 1790, to raise this depressed race to the level of the white one. If such were its purpose, it is strange that the word chosen to effect it, should have been the very one chosen by the convention of 1776, to designate a white elector. "Every *freeman,*" it is said, chap. II, sect. 6, " of the full age of twenty-one years, having resided in this state for a space of one whole year before the day of election, and paid taxes during that time, shall enjoy the rights of an elector."

Now if the word freeman were not potent enough to admit a free negro to suffrage, under the first constitution, it is difficult to discern a degree of magic in the intervening plan of emancipation, sufficient to give it adequate potency, in the apprehension of the convention under the second.

The only thing in the history of the convention, which casts a doubt upon the intent, is the fact, that the word white was prefixed to the word freeman, in the report of the committee, and subsequently struck out; probably because it was thought superfluous, or still more probably, because it was feared that respectable men of dark complexion would often be insulted at the polls, by objections to their colour. I have heard it said, that Mr Gallatin sustained his motion to strike out on the latter ground. Whatever the motive, the disseverance is insufficient to warp the interpretation of a word on such settled and determinate meaning as the one which remained. A legislative body speaks to the judiciary only through its final act, and expresses its will in the words of it; and though their meaning may be influenced by the sense in which they have usually been applied to intrinsic matters, we cannot receive an explanation of them from what has been moved or said in debate. Were he even disposed to pry into the motives of

[Hobbs and others v. Fogg.]

the members, it would be impossible for him to ascertain them; and in attempting to discover the ground on which the conclusion was attained, it is not probable that a member of the majority could indicate any thing that was common to all. Previous propositions are merged in the act of consummation; and the interpreter of it must look to that alone.

I have thought it fair to treat the question as it stands affected by our own municipal regulations without illustration from those of other states, where the condition of the race has been still less favoured. Yet it is proper to say that the second section of the fourth article of the federal constitution, presents an obstacle to the political freedom of the negro, which seems to be insuperable. It is to be remembered that citizenship as well as freedom, is a constitutional qualification; and how it could be conferred so as to overbear the laws imposing countless disabilities on him in other states, is a problem of difficult solution. In this aspect the question becomes one, not of intention, but of power; and of power so doubtful as to forbid the exercise of it. Every man must lament the necessity of these disabilities; but slavery is to be dealt with by those whose existence depends on the skill with which it is treated. Considerations of mere humanity, however, belong to a class with which, as judges, we have nothing to do; and interpreting the constitution in the spirit of our institutions, we are bound to pronounce that men of colour are destitute of title to the elective franchise. Their blood, however, may become so diluted in successive descents as to lose its distinctive character; and, then, both policy and justice require that previous disabilities should cease. By the amended constitution of North Carolina, no free negro, mulatto, or free person of mixed blood, descended from negro ancestors, to the fourth generation inclusive, *though one ancestor of each generation may have been a white person,* shall vote for members of the legislature.

I regret to say, no similar regulation for practical purposes, has been attempted here; in consequence of which, every case of disputed colour must be determined by no particular rule, but by the discretion of the judges; and thus a great constitutional right, even under the proposed amendments of the constitution, will be left the sport of caprice. In conclusion, we are of opinion, the court erred in directing that the plaintiff could have his action against the defendant for the rejection of his vote.

Judgment reversed.