# The West Chester and Philadelphia Railroad Company *versus* Miles.

1. No one can be excluded from carriage by a public carrier on account of color, religious belief or political relations or prejudice.

2. If there be no clear and reasonable difference to base separation of passengers upon, it cannot be justified by mere prejudice.

3. The right of a carrier to separate passengers is founded on his right of private property in the means of conveyance and the public interest.

4. It *is* not an unreasonable regulation to seat passengers *so as to preserve* order and decorum and prevent contacts and collisions arising from natural and well-known repugnancies, which are liable to breed disturbances by promiscuous sitting.

5. The right of the passenger is only that of being carried safely and

5 P. F. SMITH—14

[West Chester and Philadelphia Railroad Co. *v.* Miles.]

with a due regard to his personal comfort and convenience; these are promoted by a sound and well regulated separation of passengers.

6. It is the duty of a conductor to repress tumults as far as he reasonably can, and on extraordinary occasions he may stop the train and eject the unruly, but he cannot arrest and detain offenders.

7. Before the Act of March 22d 1867, the separation of black and white passengers in a public conveyance was the subject of a sound regulation to secure order, promote comfort, preserve the peace and maintain the rights of both carriers and passengers.

April 1st 1867.    Before WOODWARD, C. J., THOMPSON STRONG, READ and AGNEW, JJ.

Error to the Court of Common Pleas of *Philadelphia*.

This was an action of trespass, brought by Mary E. Miles against the West Chester and Philadelphia Railroad Company, for removing her from the car by a conductor on defendants' railroad.

Mary E. Miles, a colored woman, the plaintiff, got into the car of the defendants below, at Philadelphia, to go to Oxford, and took a seat at or near the middle of it. A rule of the road required the conductor to make colored persons sit at one end of the car. He got a seat for her at the place fixed by the rule, and asked her to take it. She declined positively and persistently to do it. The conductor told her of the rule, requested her to take the other seat, warned her that he must require her to leave the cars if she refused, and at last put her out. There was no allegation that any force was used greater than was necessary to accomplish the object of compelling her to leave the cars.

Defendants requested the court to charge :—

1. If the conductor in this case acted in pursuance of a rule of the company, or of its proper officer, requiring a person of color to sit in a certain part of any car into which he might enter, and, in enforcing the rule, used no more violence than was necessary under the circumstances, the jury must find for the defendant.

4. If the jury find that the seat which the plaintiff was directed to take, was in all respects a comfortable, safe and convenient seat, not inferior in any respect to the one she was directed to leave, she cannot recover.

The court (Pierce, A. J.) charged :—

"That a regulation which prohibits a well-behaved colored person from taking a vacant seat in a car simply because she is colored, is not a regulation which the law allows."

The judge also denied the defendants' 1st and 4th points, and as to the latter added, "that defendants could not compel plaintiff to change her seat simply on account of her color;" to which defendants excepted.

There was a verdict for the plaintiff for $5.

The defendants removed the case to the Supreme Court, and assigned the instructions of the court below for error.

[West Chester and Philadelphia Railroad Co. v. Miles.]

*E. S. Miller*, for plaintiff in error, cited Coppin v. Braithwaite, 8 Jur. 875; Jencks v. Coleman, 2 Sumner 321; Gaines v. McCandless, 4 Phila. R. 255; Markham v. Brown, 8 N. H. 530; Conner v. Pierce, 7 Metc. 600; State v. Overton, 4 Zab. 434.

*G. H. Earle* and *R. P. White*, for defendant in error, cited Angell on Carriers, § 525, 533; Chitty on Carriers, § 15, p. 54, § 263, p. 346; 2 Kent Com. § 598; Pierce on Am. R. R. 489; Power v. Commonwealth, 6 Metc. 600; Bennett v. Dutton, 10 N. H. 481; Jenks v. Coleman, 2 Sumner 221; Markham v. Brown, 8 N. H. 530; Conner v. Pierce, 7 Metc. 600; State v. Overton, 4 Zab. 441; Gaines v. McCandless, 4 Phila. 255; Derry v. Lowry, Court of Common Pleas of Philadelphia, May 1st 1865, per Allison, P. J.; Kessler v. McConachy, 1 Rawle 436; O'Donnell v. Seybert, 13 S. & R. 57; Story on Bailments, § 591; Moore v. Fitchburg Railroad, 4 Gray 465; Beekman v. Saratoga Railroad, 3 Paige N. Y. 75; Galena Railroad v. Yarwood, 15 Ill. R. 472; N. & C. R. R. v. Messimo, 1 Sneeds. 220.

The opinion of the court was delivered, November 4th 1867, by AGNEW, J.—It is admitted no one can be excluded from carriage by a public carrier on account of color, religious belief, political relations or prejudice. But the defendants in their point asked the court to say that if the jury find that the seat which the plaintiff was directed to take *was in all respects a comfortable, safe and convenient seat, not inferior in any of these respects to the one she was directed to leave*, she could not recover. The case, therefore, involves no assertion of the inferiority of the negro to the white passenger, but, conceding his right to be carried on the same footing with the white man, it assumes it to be not unreasonable to assign places in the cars to passengers of each color. The simple question is, whether a public carrier may, in the exercise of his private right of property, and in the due performance of his public duty, separate passengers by any other well-defined characteristic than that of sex. The ladies' car is known upon every well-regulated railroad, implies no loss of equal right on the part of the excluded sex, and its propriety is doubted by none.

This question must be decided upon reasonable grounds. If there be no clear and reasonable difference to base it upon, separation cannot be justified by mere prejudice. Nor is merit a test. The negro may be proud of his service in the field as a defender of his country. But it was not thought indefensible to separate even white soldiers from other passengers. There was a clear and well-founded difference between the civil and military character, and the separation of soldiers from citizens implied no want of equality, but a sound regulation of the right of transit.

[West Chester and Philadelphia Railroad Co. *v.* Miles.]

The right of the carrier to separate his passengers is founded upon two grounds—his right of private property in the means of conveyance, and the public interest. The private means he uses belong wholly to himself, and imply the right of control for the protection of his own interest, as well as the performance of his public duty. He may use his property, therefore, in a reasonable manner. It is not an unreasonable regulation to seat passengers so as to preserve order and decorum, and to prevent contacts and collisions arising from natural or well-known customary repugnancies, which are likely to breed disturbances by a promiscuous sitting. This is a proper use of the right of private property, because it tends to protect the interests of the carrier as well as the interests of those he carries. If the ground of regulation be reasonable, courts of justice cannot interfere with his right of property. The right of the passenger is only that of being carried safely, and with a due regard to his personal comfort and convenience, which are promoted by a sound and well-regulated separation of passengers. An analogy and an illustration are found in the case of an innkeeper, who, if he have room, is bound to entertain proper guests, and so a carrier is bound to receive passengers. But a guest in an inn cannot select his room or his bed at pleasure; nor can a voyager take possession of a cabin or a berth at will, or refuse to obey the reasonable orders of the captain of a vessel. But, on the other hand, who would maintain that it is a reasonable regulation, either of an inn or a vessel, to *compel* the passengers, black and white, to room and bed together? If a right of private property confers no right of control, who shall decide a contest between passengers for seats or berths? Courts of justice may interpose to compel those who perform a business concerning the public, by the use of private means, to fulfil their duty to the public,—but not a whit beyond.

The public also has an interest in the proper regulation of public conveyances for the preservation of the public peace. A railroad company has the right and is bound to make reasonable regulations to preserve order in their cars. It is the duty of the conductor to repress tumults as far as he reasonably can, and he may, on extraordinary occasions, stop his train and eject the unruly and tumultuous. But he has not the authority of a peace officer to arrest and detain offenders. He cannot interfere in the quarrels of others at will merely. In order to preserve and enforce his authority as the servant of the company it must have a power to establish proper regulations for the carriage of passengers. It is much easier to prevent difficulties among passengers by regulations for their proper separation, than it is to quell them. The danger to the peace engendered by the feeling of aversion between individuals of the different races cannot be denied. It is the fact with which the company must deal. If

[West Chester and Philadelphia Railroad Co. v. Miles.]

a negro take his seat beside a white man or his wife or daughter, the law cannot repress the anger, or conquer the aversion which some will feel.   However unwise it may be to indulge the feeling, human infirmity is not always proof against it.   It is much wiser to avert the consequences of this repulsion of race by separation, than to punish afterward the breach of the peace it may have caused.   These views are sustained by high authority.   Judge Story, in his Law of Bailments, stating the duty of passengers " to submit to such reasonable regulations as the proprietors may adopt for the convenience and comfort of the other passengers as well as for their own proper interests," says, " the importance of the doctrine is felt more strikingly in cases of steamboats and railroad cars :" § 591, a ; see also § 476, a ; Angell on Carriers, § 528 ; 1 American Railway Cases, 393, 394.

The right to separate being clear in proper cases, and it being the subject of sound regulation, the question remaining to be considered is, whether there is such a difference between the white and black races within this state, resulting from nature, law and custom, as makes it a reasonable ground of separation.   The question is one of difference, not of superiority or inferiority.   Why the Creator made one black and the other white, we know not ; but the fact is apparent, and the races distinct, each producing its own kind, and following the peculiar law of its constitution.   Conceding equality, with natures as perfect and rights as sacred, yet God has made them dissimilar, with those natural instincts and feelings which He always imparts to His creatures when He intends that they shall not overstep the natural boundaries He has assigned to them.   The natural law which forbids their intermarriage and that social amalgamation which leads to a corruption of races, is as clearly divine as that which imparted to them different natures. The tendency of intimate social intermixture is to amalgamation, contrary to the law of races.   The separation of the white and black races upon the surface of the globe is a fact equally apparent.   Why this is so it is not necessary to speculate ; but the fact of a distribution of men by race and color is as visible in the providential arrangement of the earth as that of heat and cold. The natural separation of the races is therefore an undeniable fact, and all social organizations which lead to their amalgamation are repugnant to the law of nature.   From social amalgamation it is but a step to illicit intercourse, and but another to intermarriage.   But to assert separateness is not to declare inferiority in either ; it is not to declare one a slave and the other a freeman— that would be to draw the illogical sequence of inferiority from difference only.   It is simply to say that following the order of Divine Providence, human authority ought not to compel these widely separated races to intermix.   The right of such to be free from social contact is as clear as to be free from intermarriage.

[West Chester and Philadelphia Railroad Co. *v.* Miles.]

The former may be less repulsive as a condition, but not less entitled to protection as a right. When, therefore, we declare a right to maintain separate relations, as far as is reasonably practicable, but in a spirit of kindness and charity, and with due regard to equality of rights, it is not prejudice, nor caste, nor injustice of any kind, but simply to suffer men to follow the law of races established by the Creator himself, and not to compel them to intermix contrary to their instincts.

Nor can we disregard the laws and customs of the state. Indeed, these must be our guide, leaving it to the legislature to correct the errors of the law, or its departure from that justice which should be its foundation. It is unnecessary to recur to the original condition of negroes as slaves in Pennsylvania, or to trace the legislation of the province distinguishing them from freemen. Nor need we, for the purpose of defining the *status* of the negro, refer to that great law of emancipation in 1780 whose preamble, the most beautiful, just and expressive ever prefixed to a human statute, only professed to extend to the black race, " a portion" of our own freedom. We have a later and an authoritative guide, the solemn decision of this court, in 1837, in the case of Hobbs *v.* Fogg, 6 Watts 553. The opinion came from the pen of the late C. J. Gibson, and bears the imprint of his remarkable intellect. It is there shown, from the laws, constitutions and customs of the state, and from a former decision of the High Court of Errors and Appeals, that the *status* of the negro never fell within the term "freeman" in the several constitutions; and that the Emancipation Act of 1780 did not elevate him to the citizenship of the state. And in 1838, the people of this Commonwealth, by an express amendment of their constitution, drew the line directly between the white citizens and the black inhabitants of the state. It is clear, therefore, that under the constitution and laws the white and black races stand in a separate relation to each other. We find the same difference in the institutions and customs of the state. Never has there been an intermixture of the two races, socially, religiously, civilly or politically. By uninterrupted usage the blacks live apart, visit and entertain among themselves, occupy separate places of public worship and amusement, and fill no civil or political stations, not even sitting to decide their own causes. In fact, there is not an institution of the state in which they have mingled indiscriminately with the whites. Even the common school law provides for separate schools when their numbers are adequate. In the military service, also, they were not intermixed with the white soldiers, but were separated into companies and regiments of color, and this not by way of disparagement, but from motives of wisdom and prudence, to avoid the antagonisms of variant and immiscible races. Law and custom having sanctioned a separation of races, it is not the province of

[West Chester and Philadelphia Railroad Co. *v.* Miles.]

the judiciary to legislate it away. We cannot say there was no difference in fact, when the law and the voice of the people had said there was. The laws of the state are found in its constitution, statutes, institutions and general customs. It is to these sources judges must resort to discover them. If they abandon these guides they pronounce their own opinions, not the laws of those whose officers they are. Following these guides, we are compelled to declare that, at the time of the alleged injury, there was that natural, legal and customary difference between the white and black races in this state which made their separation as passengers in a public conveyance the subject of a sound regulation to secure order, promote comfort, preserve the peace and maintain the rights both of carriers and passengers. The defendants were therefore entitled to an affirmative answer to the point recited at the beginning of this opinion.

It only remains to add that this cause arose before the passage of the Act of 22d March 1867, declaring it an offence for railroad companies to make any distinction between passengers on account of race or color, and our decision pronounces the law only as it stood when the case arose, leaving the act to operate upon such cases as shall fall within its provisions. Indeed the act itself is an indication of the legislative understanding of the law as it stood before the passage of the act.

Judgment reversed, and a *venire facias de novo* awarded.

READ, J., dissents.