## STATE v. WILLIAM DARNELL.

### (Filed 8 April, 1914.)

Cities and Towns—Ordinances—Segregation of Races—Statutes—Interpretation.

> Legislative authority given to a town to pass any ordinance for the good order, good government, or general welfare of the city, provided it does not contravene the laws and Constitution of the State, does not contemplate the passage of an ordinance prohibiting the ownership of land in certain locations and districts, by white or colored people, in accordance with whether the majority of the landowners in that district are white or colored people, such being in contravention of the general policy of the State and questionable as to its validity under the Federal Constitution.

APPEAL by defendant from *Devin, J.,* at Spring Term, 1913, of FORSYTH.

*Attorney-General and Gilbert T. Stephenson for the State.*
*Watson, Buxton & Watson for defendant.*

CLARK, C. J. On 5 July, 1912, the board of aldermen of Winston, N. C., adopted an ordinance which made it unlawful for any colored person to occupy as a residence any house upon any street or alley between two adjacent streets on which a greater number of houses are occupied as residences by white people than are occupied as residences by colored people. Another section of the ordinance made a similar restriction against white people occupying as residences houses on streets where there are more houses occupied by colored residents than by whites. In 1913 the defendant William Darnell, a colored man, moved his family into a house on Highland Avenue, to occupy it as a residence. At that time, in the other houses on that street and block there were more white families than colored. The defendant was tried in the municipal court for violating this ordinance, and being found guilty, he was fined, and appealed. In the Superior Court he was again found guilty and fined, and appealed to this Court.

The only authority which the board of aldermen claim for the passage of this ordinance is section 44 of the city charter, which provides that the aldermen "may pass any ordinance which they may deem wise and proper for the good order, good government, or general welfare of the city, provided it does not contravene the laws and Constitution of the State." In 1 Dillon Mun. Corp., sec. 89, which is copied and approved in *S. v. Webber,* 107 N. C., 962; 22 Am. St., 920, it is said: "It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: (1) Those granted in express words; (2) Those necessarily or fairly implied; (3) Those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the exercise is resolved by the courts against the corporation, and the power is denied." In *S. v. Thomas* the Court reiterated this doctrine and quoted with approval 1 Dillon Mun. Corp., sec. 325, as follows: "An ordinance cannot legally be made which contravenes a common right, unless the power to do so be plainly conferred by a valid and competent legislative grant." In *S. v. Dannenberg,* 150 N. C., 800, it was held: "Municipal corporations can only exercise such police powers as are granted by their charters, and all fair and reasonable doubts as to whether such powers have been conferred are resolved by the courts against their being exercised."

The brief for the State frankly says: "It is not claimed that the city of Winston had any express grant of power to pass a segregation ordinance. To uphold the validity of such an ordinance, therefore, it must be shown that the passage of it was a reasonable exercise of the police power." Revisal, 2923, is broader even than this provision of the charter, for it gives town commissioners "power to make ordinances, rules and regulations for the better government of the town not inconsistent with this chapter and the law of the land, as they may deem necessary," and to enforce them by suitable penalties. It is held under this last section that such ordinances and by-laws must be in har-

mony with the general laws of the State. *Washington v. Hammond,* 76 N. C., 33; *S. v. Langston,* 88 N. C., 692; *S. v. Brittain,* 89 N. C., 574.

We do not think that the authority conferred by section 44 of the charter to enact ordinances for the "general welfare of the city" can justly be construed as intended by the Legislature to authorize an ordinance of this kind which establishes a public policy which has hitherto been unknown in the legislation of our State. To do so would give to the words "general welfare" an extended and wholly unrestricted scope, which we do not think the Legislature could have contemplated in using those words. If the board of aldermen is thereby authorized to make this restriction, a bare majority of the board could, if they may "deem it wise and proper," require Republicans to live on certain streets and Democrats on others; or that Protestants shall reside only in certain parts of the town and Catholics in another; or that Germans or people of German descent should reside only where they are in the majority, and that Irish and those of Irish descent should dwell only in certain localities, designated for them by the arbitrary judgment and permission of a majority of the aldermen. They could apply the restriction as well to business occupations as to residences, and could also prescribe the localities allotted to each class of people without reference to whether the majority already therein is of the prescribed race, nationality, or political or religious faith.

Besides, an ordinance of this kind forbids the owner of property to sell or to lease it to whomsoever he sees fit, as well as forbids those who may be desirous of buying or renting property from doing so where they can make the best bargain. Yet this right of disposing of property, the *jus disponendi,* has always been held one of the inalienable rights incident to the ownership of property, which no statute will be construed as having power to take away. In *Bruce v. Strickland,* 81 N. C., 267, it is said: "The *jus disponendi* is an important element of property and a vested right protected by the clause in the Federal Constitution which declares the obligation of contracts inviolable." The same doctrine is fully held and discussed in *Hughes v. Hodges,*

102 N. C., 239, and in the numerous citations to those two cases which will be found in the Anno. Ed. This ordinance forbids a white man or a colored man to live in his own house if it should descend to him by inheritance and should happen to be located on a street where the majority of the residents happen to be of such different race. There is no reason why the power of the county commissioners to provide for the public welfare should not be as broad as those of the town commissioners, and if under such general authority similar regulations are prescribed for the country districts, one who should buy or inherit property in a section where the opposite race is in the majority could not reside on his own property, and he could not sell it or rent it out except to persons of such different race, since none other could reside there. Neither a white manager nor any white tenants could reside on a farm where a majority of the tenants or hands are colored.

In Ireland there were years ago limits prescribed beyond which the native Irish or Celtic population could not reside. This was called the "Irish Pale," and one of the results was continued disorder and unrest in that unhappy island, which had as one of its consequences that more than half its population came to this country. That policy has since been reversed. But in Russia, to this day, there are certain districts to which the Jews are restricted, with the result that vast numbers of them are emigrating to this country. We can hardly believe that the Legislature by the ordinary words in a charter authorizing the aldermen to "provide for the public welfare" intended to initiate so revolutionary a public policy. Had this been intended there would certainly have been a thorough discussion and a full consideration by the General Assembly of the question whether under the Constitution of the United States and of this State the Legislature could establish a policy which would deny to the owners of lands, either in the country or town, the right to dispose of them by sale or renting to whomsoever they saw fit, as of ancient right they had been long accustomed to do, or to restrict any class of citizens from buying or renting where they wished.

Indeed, so far as the declaration of a public policy is concerned, when a few years ago labor agents began carrying out of the State the colored laborers on whom many farmers depended for the cultivation of their crops which alone maintained the value of their lands, the Legislature promptly passed ch. 75, Laws 1891, which made it indictable to exercise such vocation without having first paid a license fee of $1,000. When that act was held invalid in *S. v. Moore,* 113 N. C., 697, the Legislature promptly passed another (ch. 9, Laws 1901), prescribing a smaller license fee, but making it indictable to act as agent to procure laborers for another State without obtaining such license. This was upheld in *S. v. Hunt,* 129 N. C., 686; as was also a like act to the same purport (Laws 1903, ch. 247, sec. 74) in *Carr v. Comrs.,* 136 N. C., 125.

Judging by the experience of the "Irish Pale" and of the similar restrictions upon the Jews in Russia, the result of this policy might well be a large exodus, and naturally of the most enterprising and thrifty element of the colored race, leaving the unthrifty and less desirable element in this State on the taxpayers. Such a result would be contrary to the above cited statutes by which the Legislature indicated a public policy of retaining the colored laborers in this State. The initiation by this ordinance of a public policy so little in accord with the above legislation cannot reasonably be inferred from the general expression in the charter relied upon.

There is a wide distinction between suffrage, which is not an inherent right, but which is conferred by constitutional prescription, and which is usually extended from time to time, and the inalienable right to own, acquire, and dispose of property, which is not conferred by the Constitution, but exists of natural right. There is no question that legislation can control social rights by forbidding intermarriage of the races, and in requiring Jim Crow cars and in similar matters. It was also held in *Mugler v. Kansas,* 123 U. S., 623, that as the State had the right to regulate or forbid the sale of liquor, that one who had devoted his property to such purpose could not object that he is forbidden longer to so use it; but none of these interfere with the

fundamental right of every one to acquire and dispose of property by sale. The right to devise is statutory, and therefore can be modified. *In re Garland,* 160 N. C., 555.

Whether if the General Assembly had passed a statute conferring on town or county commissioners the authority to make such an ordinance as this, it would have been constitutional, is not now before us. We simply hold that an act of this broad scope, so entirely without precedent in the public policy of the State and so revolutionary in its nature, cannot be deemed to have been within the purview of the Legislature from the use of the words conferring authority to make ordinances for the general welfare.

There was a similar restriction of the Jews to certain quarters of the towns in the middle ages, and the quarters assigned them were called "Ghettoes." If the intention of the Legislature had been to establish such policy as to the colored people either in our towns or country districts, there would certainly have been some provision prescribing the methods to be used in selecting these districts. The selection would not have been left to the arbitrary and irreviewable power of the majority of the board elected without any reference to this matter. A man whose property might be made unsalable, or reduced in value, by forbidding him to sell or rent it to a white man because the majority of the houses in such district are occupied by negroes, certainly should have some compensation from the public for his loss. The same would be true of property just across the street from one of those Ghettoes which might be established to the depreciation of his property. Then, too, both in town and country the owners of property who might be deprived of the opportunity of renting it to laboring people of color, because the majority in that section or block are white people who do not wish to rent or buy, might make an objection to the demarcation adopted. Then, too, the designation of these localities surely would not be left to a majority of the aldermen or the county commissioners without some right to have the facts found by a jury and a review of the proceedings by a court of justice.

166—20

The absence of such provisions is further evidence that the General Assembly did not intend to confer so broad and arbitrary a power upon the aldermen of Winston.

We therefore hold that the ordinance was adopted without authority of law and the indictment should have been quashed.

Action dismissed.