EDWARD MEADE *v.* MARY ESTELLE DEN-NISTONE ET AL.

[No. 26, October Term, 1937.]

*Decided January 11th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*William A. C. Hughes, Jr.,* for the appellant.

*J. S. T. Waters* and *William L. Marbury, Jr.,* with whom was *Robert R. Portmess* on the brief, for the appellees.

SLOAN, J., delivered the opinion of the Court.

This appeal is from a decree enjoining Edward Meade, a negro, and his family, from using or occupying the house and premises known as No. 2227 Barclay Street, in the City of Baltimore, enjoining him "from procuring,

authorizing or permitting any Negro or Negroes, or person or persons, either in whole or in part of Negro or African descent to use or occupy said premises," and enjoining Frank Berman, Edward Meade's vendor or assignor, from permitting Edward Meade and his family, or any other negroes or persons of African descent, from occupying the premises.

The bill of complaint was filed by Mary Estelle Dennistone, the owner of No. 2221 Barclay Street, and Mary J. Becker, the owner and occupant of No. 2234 Barclay Street, who had, with fifteen other owners of property in the 2200 block on Barclay Street, one of them owning two houses, by agreement dated November 14th, 1927, duly acknowledged and recorded, covenanted and agreed, each with the others, for themselves, their personal representatives and assigns, that neither the said respective properties nor any of them nor any part of them or any of them shall be at any time occupied or used by any negro or negroes or person or persons either in whole or in part of negro or African descent except only that negro or persons of negro or African descent either in whole or in part may be employed as servants by any of the owners or occupants of said respective properties and as and whilst so employed may reside on the premises occupied by their respective employers nor shall any sale, lease, disposition or transfer thereof be made or operate otherwise than subject to the aforesaid restrictions as to and upon use and occupancy", that all the covenants, conditions, etc., shall "run with and bind the land," and shall be enforceable by any one owning or having any interest in any of the properties affected. The final provision was: "That a majority of the parties to this agreement may by an instrument in writing duly executed acknowledged and recorded according to law at any time after the execution of this agreement remove the entire property affected by this agreement from the operation and effect of this agreement."

According to the record: "The agreement dated on November 14, 1927, was proposed as a result of a meeting

of the property owners in an area of twenty-four square blocks bounded on the north and south by Twenty-fifth Street and North Avenue and on the east and west by Barclay and Charles Streets." This area included six blocks on Barclay Street, but we are only concerned in this case with the 2200 block on Barclay Street.

No. 2227 Barclay Street was owned and the agreement executed by Anne M. Tighe, Francis L. Tighe, Mary V. Tighe, and Anna R. Gugerty, who, by deed of May 27th, 1935, conveyed to Florus Barry, who, on the same day conveyed to Mary V. Tighe and Anna R. Gugerty, and they, by deed of November 4th, 1935, conveyed to Frank Berman. On October 22nd, 1936, Berman contracted to sell to Edward Meade, a negro, for $1,100, on account of which he paid $150 in cash, the balance to be paid in monthly installments. Meade entered into possession, and, with his family, occupied the house, and on November 24th, 1936, the bill for injunction against him and Berman was filed. No. 2238 Barclay Street, at the corner of Twenty-third Street, is owned and occupied by negroes and was not included in the agreement. It has a dressmaking shop, with an entrance on Barclay Street, run by two colored women who cater exclusively to white trade; the second floor, entered from Twenty-third Street, is occupied by a colored man and his wife. This is the only house from North Avenue to Twenty-fifth Street, six blocks and a half, occupied by colored people. Intersecting streets, Twenty-second and a Half and Twenty-third Streets and Guilford Avenue, one block east, are heavily populated by negroes. Since the signing of the agreement of November 14th, 1927, there has been no occupancy of Barclay Street by negroes until the present instance. The owners of eleven properties in the 2200 block on Barclay Street did not join in the agreement, but they have since then undertaken to bring themselves in, as noted farther on.

Mrs. Becker, one of the plaintiffs, testified that it was her understanding that all of the owners in the block would sign the agreement, and, while she would not have

been interested in signing unless all would, she "thought a majority ruled." She testified without objection that "after the corner house was sold there was new families moved and bought property there, and then they got together and signed up those other eleven houses." Mrs. Dennistone testified: "When they came to me to sign the agreement they had not gotten all the signatures. I did not know they had not later gotten all and I do not know it now. I knew they were going to all of them to get them. They came to me before they had gone to the rest. I did not know 2238 was signed up until the present time." She said she would have signed whether all were obtained or not. Plaintiffs offered in evidence an agreement to the same effect as the one in evidence "signed by a number of property owners" in the 2200 block (number not mentioned), who had not signed the original agreement, executed and recorded December 14th, 1936. It had been executed July 21st, 1936, but was defectively acknowledged. On objection by the defendants it was not admitted, though Mrs. Becker's statement was in without objection. *Laporte v. Pennsylvania-Dixie Cement Corp.*, 164 Md. 642, 649, 165 A. 195, 168 A. 844.

The defendants contend that the agreement is a personal covenant and does not run with the land; is contrary to public policy; that there is no privity of estate or contract between the covenantor and the covenantee's assignee; is an unreasonable restraint on alienation; the reasons for its execution no longer obtain; is repugnant to the grant; and that its enforcement would be in violation of the Fourteenth Amendment to the Federal Constitution. The converse of each of these contentions is as vigorously maintained by the plaintiffs.

It is not contended that either the State, through its Legislature, or the City of Baltimore, by ordinance, can enforce segregation of the white and colored populations. The question arose in this state in the case of *State v. Gurry*, 121 Md. 534, 88 A. 546, but, while the ordinance was held invalid, the question of segregation was not decided. After the decision in *Buchanan v. War-*

*ley,* 245 U. S. 60, 38 S. Ct. 16, L. Ed. 149, L. R. A. 1918C, 210, where a segregation ordinance of the City of Louisville, Kentucky, was held invalid as in violation of the Fourteenth Amendment, any efforts in this direction by any state legislature or subdivision of a state must fail. *Tyler v. Harmon,* 158 La. 439, 104 So. 200; *Harmon v. Tyler,* 273 U. S. 668, 47 S. Ct. 471, 71 L. Ed. 831; *State v. Darnell,* 166 N. C. 300, 81 S. E. 338; *Carey v. Atlanta,* 143 Ga. 192, 84 S. E. 456. After *State v. Gurry, supra,* another segregation ordinance was passed by the City of Baltimore, which, following the *Warley* case in the Supreme Court, was held invalid in *Jackson v. State,* 132 Md. 311, 103 A. 910.

It has been held, and frequently, that segregation is allowable on railroads, in schools and in public places, provided equal facilities are afforded (*Lee v. State,* 164 Md. 550, 165 A. 614), and disallowed when they are not. *University of Maryland v. Murray,* 169 Md. 478, 182 A. 590; *Maddox v. Neal,* 45 Ark. 121; *Williams v. Board of Education,* 79 Kan. 202, 99 P. 216; *Roberts v. Boston,* 5 Cush. (Mass.) 198; *Berea College v. Kentucky,* 211 U. S. 45, 29 S. Ct. 33, 53 L. Ed. 81; *Id.,* 123 Ky. 209, 94 S. W. 623; *Plessy v. Ferguson,* 163 U. S. 537, 16 S. Ct. 1138, 1140, 41 L. Ed. 256; *West Chester & P. Ry. Co. v. Miles,* 55 Pa. 209. In *Plessy v. Ferguson, supra,* the question was the validity of a statute of Louisiana requiring railways, carrying passengers in that state, to provide separate accommodations for white and colored passengers. In holding that such an act was not in violation of the Fourteenth Amendment, the Supreme Court, in an opinion by Mr. Justice Brown, said: "The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation, in places where they are liable to be brought into contact, do not neces-

sarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power." See, also, the opinion of Judge Agnew in *West Chester & Philadelphia R. Co. v. Miles*, 55 Pa. 209, and of Chief Justice Shaw in *Roberts v. Boston*, 5 Cush. (Mass.) 198. It is not easy to explain the distinction between the decisions which say that segregation is allowable on trains, in schools and in public places, and those which say that it cannot be done with respect to residence in cities, in many of which it has become a problem, more social than legal, of which to date there has been no satisfactory solution. 32 Michigan Law Review 721.

The large, almost sudden, emigration of negroes from the country to the cities, with the consequent congestion in colored centers, has created a situation about which all agree something ought to be done. In Baltimore City, with a population of about 850,000, one-seventh is negro, occupying a relatively small portion of the city's territory, though the colored area has been, in the last several years, rapidly expanding. Since the decisions under the Fourteenth Amendment, *supra*, no public action can be taken to solve what has become a problem, and property owners have undertaken to regulate it by contract.

The contention that the defendant is denied by this contract the equal protection of the laws under the Fourteenth Amendment has been settled by decisions of the Supreme Court that the constitutional inhibition is upon the power of the state, and not on the right of individuals to contract with respect to their property. *United States v. Cruikshank*, 92 U. S. 542, 23 L. Ed. 588; *Virginia v. Rives*, 100 U. S. 313, 25 L. Ed. 667; *United States v. Harris*, 106 U. S. 629, 1 S. Ct. 601, 27 L. Ed. 290; *Civil Rights Cases*, 109 U. S. 3, 31, 3 S. Ct. 18, 27 L. Ed. 835. In the case of *Corrigan v. Buckley*, 55 App. D. C. 30, 299 Fed. 899, 900, the District of Columbia Court of Appeals upheld an agreement entered into by twenty-nine property-owners in the District of Columbia, whereby

302

they agreed, each with the others, that no part of their respective lands "shall ever be used or occupied by, or sold, conveyed, leased, rented, or given to, negroes, or any person or persons of the negro race or blood. This covenant shall run with the land and bind the respective heirs and assigns of the parties hereto for the period of twenty-one (21) years from and after the date of these presents." The suit was to restrain Corrigan, one of the parties to the contract, from selling to a colored man named Curtis. On appeal, *Corrigan v. Buckley*, 271 U. S. 323, 46 S. Ct. 521, 523, 70 L. Ed. 969, the defendants, appellants, contended that the contract violated their rights under the Fifth, Thirteenth and Fourteenth Amendments. "This contention," said the court, "is entirely lacking in substance or color of merit. * * * None of these amendments prohibited private individuals from entering into contracts respecting the control and disposition of their own property," and "the appeal must be, and is dismissed for want of jurisdiction." The constitutional question here raised having been thus settled by an authority which, unless and until overruled, must be accepted, the only thing for us to decide is whether the agreement before us is adequate to accomplish the purpose intended, or whether it can be done at all.

The defendants contend that this is a covenant that does not run with the land, that it is personal only to the parties to the original agreement, and not to the assignees or grantees of any of them. In our opinion this contention is answered in the case of *Trustees of Columbia College v. Lynch*, 70 N. Y. 440, 448, where it was said: "It is strenuously urged * * * that there was no privity of estate between the mutual covenantors and covenantees, in respect of the premises owned by them respectively, and which were the subjects of the covenants and agreements, and that the covenants did not therefore run with the lands, binding the grantees, and subjecting them to a personal liability thereon. This may be conceded for all the purposes of this action. It is of no importance whether an action at law could be main-

tained against the grantees of Beers, as upon a covenant running with the land and binding them. Whether it was a covenant running with the land or a collateral covenant, or a covenant in gross, or whether an action at law could be sustained upon it, is not material as affecting the jurisdiction of a court of equity, or the right of the owners of the dominant tenement to relief upon a disturbance of the easements." *Bronson v. Coffin*, 108 Mass. 175, 180. In the comparatively recent case of *Clem v. Valentine*, 155 Md. 19, 26, 141 A. 710, 712, this court said: "It seems to be well settled by the weight of authority that any grantee of the land to which such right is appurtenant acquires by his grant a right to have the servitude, or easement, or right of amenity, protected in equity, notwithstanding that his right may not rest on the covenant, which simply runs with the title to his land, and notwithstanding that it may also be true that he may not be able to maintain an action at law for the vindication of his right. Nor is it necessary, in order to sustain the action, that there should be privity of estate or contract, but there must be found somewhere the clear intent to establish the restriction for the benefit of the party attempting to restrain its infringement." "The question is not whether the covenant runs with the land but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor and with notice of which he purchased." *Tulk v. Moxhay*, 2 Phillips 774; *Newbold v. Peabody Heights Co.*, 70 Md. 493, 17 A. 372; *Peabody Heights Co. v. Willson*, 82 Md. 186, 32 A. 386, 1077. And Mr. Tiffany (2 *Real Property* [2nd Ed.] 1426) says: "It may be independent of any conveyance of land, being merely an agreement between adjoining owners as regards the use of their land," and cites amongst other cases *Trustees of Columbia College v. Lynch, supra; Pomeroy, Equity Jur.* (4th Ed.), secs. 688, 789. The effect of the agreement in evidence here is that each of the signatories granted to all of the others an easement in his or her property, which inures to the benefit, not

only of the grantees, but, by its terms, to his, her, and their heirs, personal representatives and assigns. The important question then is whether the parties to the agreement have imposed such a restraint on the alienation of their respective properties as to render the agreement void. The solution of this question, in the cases which have arisen, turns upon the application of the fifteenth century *dicta* of Sir Thomas Littleton with regard to the restrained disposition of individual property, which found its clearest expression in Judge Christiancy's opinion, according to *Gray, Restraints on Alienation*, in the case of *Mandlebaum v. McDonell*, 29 Mich. 78, which, if strictly followed, would mean that any restraint to any person or class, even for a day, would be invalid. *Rosher v. Rosher*, L. R. Ch. D. 801; *De Peyster v. Michael*, 6 N. Y. 467; *Manierre v. Welling*, 32 R. I. 104, 78 A. 507. There are decisions, and some *dicta*, that restraints may be imposed by excepting conveyances to certain persons and their heirs and for a definite time within the limits of perpetuities, but not restricting the right to convey to certain persons or groups exclusively. 2 *Tiffany, Real Property* (2nd Ed.) 2310. Sir George Jessel said in *Re MacLeay* (1875) L. R., 20 Eq. 185, but not followed in *Rosher v. Rosher, supra,* that "You may restrict alienation in many ways. You may restrict alienation by prohibiting a particular class of alienation, or you may restrict alienation by prohibiting it to a particular class of individuals, or you may restrict alienation by restricting it to a particular time," and Mr. Justice Field, in *Cowell v. Colorado Springs Co.,* 100 U. S. 55, 57, 25 L. Ed. 547, said: "The owner of property has a right to dispose of it with a limited restriction on its use, however much the restriction may affect the value or the nature of the estate. Repugnant conditions are those which tend to the utter subversion of the estate, such as prohibit entirely the alienation or use of the property. Conditions which prohibit its alienation to particular persons or for a limited period, or its subjection to particular uses, are not subversive of the estate: they do not destroy or limit its

alienable or inheritable character." This quotation is characterized in *Porter v. Barrett,* 233 Mich. 373, 206 N. W. 532, as *dictum.* It may have been as to alienation, but not as to use, the decision being that a deed forbidding the sale of intoxicating liquors on the premises was valid and enforceable. In *Littleton's Tenures* (Wambaugh's Ed.), sec. 361, this appears: "But if the condition be such, that the feofee shall not alien to such a one, naming his name, or to any of his heirs, or of the issues of such a one, * * * or the like, which conditions do not take away all power of alienation from the feofee, * * * then such condition is good." 2 *Tiffany, Real Property* (2nd Ed.), 2310. In *Brown v. Hobbs,* 132 Md. 559, 104 A. 283, 284, Henry G. and Thomas B. Davis had conveyed to Wm. H. Brown, in fee simple "upon condition, however, that the said Wm. H. Brown, his heirs and assigns, shall not devise or convey the said property to any one other than some person or persons by the name of Brown, within the line of consanguinity or blood relation to the said Henry G. Davis, or Thomas B. Davis," otherwise to revert to the grantors, of which this court said: "As this restriction is not limited as to time, and is not confined to the grantee, it is apparent that it may result in limiting the power of his heir or heirs to sell or devise the property to a single person, or deprive them of that power altogether." Held invalid, "because repugnant to the fee conveyed to the grantee." *Clark v. Clark,* 99 Md. 356, 58 A. 24; *Gischell v. Ballman,* 131 Md. 260, 101 A. 698.

The weight of authority is that a total restraint on alienation, for an unlimited time, to a limited class, is void, though there is difference of opinion whether time can affect the question of the application of the rule. *Mandlebaum v. McDonell, supra.* The rule is founded on the theory that such restraints take property out of commerce, and we have decided in this state that conditions or limitations in restraint of alienation cannot be validly annexed to a grant or devise of an estate in fee (*Clark v. Clark,* 99 Md. 356, 58 A. 24), unless the property is put

in trust. *Gerke v. Colonial Trust Co.*, 114 Md. 289, 79 A. 587.

In the last thirteen years the Court of Appeals of the District of Columbia, beginning with *Corrigan v. Buckley*, 55 App. D. C. 30, 299 Fed. 899, decided June 22nd, 1924, has upheld four restrictive deeds, two of which were on conditions inserted by the owners of the entire tract, that the grantee, his heirs and assigns, should not sell or lease to negroes, the other two cases, with substantially the same provision, having been on an agreement between the several owners of property, as in this case. The other three cases were, *Torrey v. Wolfes*, 56 App. D. C. 4, 6 Fed. (2nd) 702; *Russell v. Wallace*, 58 App. D. C. 357, 30 Fed. (2nd) 981, 983 and *Cornish v. O'Donoghue*, 58 App. D. C. 359, 30 Fed. (2nd) 983, petitions for certiorari having been denied in the two latter cases, 279 U. S. 871, 49 S. Ct. 512, 73 L. Ed. 1007. The agreement in *Corrigan v. Buckley* was limited to twenty-one years, the other three unlimited in time. Similar conditions or covenants were sustained in *Koehler v. Rowland*, 275 Mo. 573, 205 S. W. 217, and in *Queensborough Land Co. v. Cazeaux*, 136 La. 724, 67 So. 641, the restriction being limited in both cases to twenty-five years. To the same effect, *Title Guarantee & Trust Co. v. Garrott*, 42 Cal. App. 152, 183 P. 470; *Los Angeles Investment Co. v. Gary*, 181 Cal. 680, 186 P. 596; *White v. White*, 108 W. Va. 128, 150 S. E. 531; *Porter v. Barrett*, 233 Mich. 373, 206 N. W. 532. In *Los Angeles Investment Co. v. Gary*, *supra*, while the provision against alienation was declared invalid, the restriction in the deed against use and occupancy by a negro was sustained, and like decisions on use and occupancy restrictions were made by the same court in *Janss Investment Co. v. Walden*, 196 Cal. 753, 239 P. 34, and in *Wayt v. Patee*, 205 Cal. 46, 269 P. 660. In *Parmalee v. Morris*, 218 Mich. 625, 188 N. W. 330, in the same court from which came the leading case of *Mandlebaum v. McDonell*, *supra*, the deed being construed amongst other restrictions provided that "Said lot shall not be occupied by a colored person." It was there

held that the provision was not opposed to the public policy of the state, nor void as a restraint on alienation, was valid as a restriction on occupancy, and enforceable in equity. 18 *C. J.* 397. The opinions in the cases cited adverse to the restriction against conveyances to negroes and other non-Caucasians all declared that, if the provisions in the deeds there involved had been against use and occupancy, the decisions would have approved them.

The rules against restraints on alienations were only intended to make conveyancing free and unrestrained, and had nothing to do with use and occupancy. It may be an anomalous situation when a colored man may own property which he cannot occupy, but, if he buys on notice of such a restriction, the consequences are the same to him as to any other buyer with notice. There is no law which forbids the property owners to agree that any given territory shall be all white or all colored. As was said by the chancellor in *Parmalee v. Morris, supra,* adopted by the Supreme Court of Michigan in its opinion: "The law is powerless to eradicate racial instincts or to abolish distinctions which some citizens do draw on account of racial differences in relation to their matter of purely private concern. For the law to attempt to abolish these distinctions in the private dealings between individuals would only serve to accentuate the difficulties which the situation presents. * * * Whether this action on the part of the owner was taken to make the neighborhood more desirable in his estimation or to promote the better welfare of himself and his grantees is a consideration which I do not believe enters into a decision of the case."

The defendants contend that the reasons for the agreement no longer obtain, that is, that the character of the neighborhood has so changed as to make the agreement ineffectual to accomplish its purpose, "by reason of the large number of colored people now occupying properties close to the 2200 block of Barclay Street, No. 2238 Barclay Street is occupied by colored people, and two intersecting streets are largely populated by them." No. 2238, which

is at the corner of Twenty-third Street, is the only house on Barclay Street, with the exception of the house No. 2227, now occupied by the defendant Meade, in which colored people reside. This does not show such a change in the neighborhood as to nullify the agreement and render it useless. If there had been such a change, and as a result property became untenanted and unmarketable, equity might relieve the parties of the burden of their agreement. This is what happened to the street in New York affected by the agreement in *Trustees of Columbia College v. Lynch, supra,* intended to protect the neighborhood as a residential section. The building of an elevated railway, and the establishment of shops and stores, defeated the purpose of the agreement, and the same was later voided by the decision in *Trustees of Columbia College v. Thacher,* 87 N. Y. 311; see *Adams v. Plaza Construction Co.,* 157 Md. 674, 145 A. 483; *Boyd v. Park Realty Corp.,* 137 Md. 36, 111 A. 129; *Summers v. Beeler,* 90 Md. 474, 45 A. 19; *Foreman v. Sadler's Executors,* 114 Md. 574, 80 A. 298; *Ringgold v. Denhardt,* 136 Md. 136, 110 A. 321.

The only other question is whether this agreement was entitled to recording under the provisions, so as to put the defendant Meade on notice of it. *Lambert v. Morgan,* 110 Md. 1, 27, 72 A. 407. As has been stated, it is immaterial whether the agreement here involved is a covenant that runs with the land, as it can be sustained as a grant of an easement by each of the parties to the agreement in his or her land to all of the others. If so, it is such appurtenance or interest as is inheritable and transferable with the land, and to be given effect beyond the ownership of the parties, and requires recording to put purchasers on notice. Code, art. 21, sec. 1; *Lowes v. Carter,* 124 Md. 678, 683-685, 93 A. 216; Act 1935, ch. 472, Code (Supp. 1935), art. 21, sec. 87. As said by this court in *Dawson v. Western Maryland Railway Co.,* 107 Md. 70, 93, 68 A. 301, 305: "It has been settled by a long line of decisions in this state that our statute, requiring deeds conveying an estate of inheritance or freehold,

or any declaration or limitation of use, or any estate above seven years, to be executed, acknowledged, and recorded as therein provided, is applicable to grants of or covenants for easements in land. *Hays v. Richardson,* 1 G. & J. 366; *Carter v. Harlan,* 6 Md. 20; *Long v. Buchanan,* 27 Md. 516; *Polk v. Reynolds,* 31 Md. 112; *Rayner v. Nugent,* 60 Md. 519; *Shipley v. Fink,* 102 Md. 219, 62 A. 360."

It is our opinion, therefore, that this agreement is lawful and enforceable, not opposed to the public policy of this state, of which the defendants had constructive notice, and the decree should be affirmed.

*Decree affirmed, with costs.*

BOND, C. J., dissents.